1  MARC J. WINTHROP – State Bar No. 63218
   SEAN A. O'KEEFE – State Bar No. 122417
2  **WINTHROP COUCHOT**
   **PROFESSIONAL CORPORATION**
3  660 Newport Center Drive, Fourth Floor
   Newport Beach, CA 92660
4  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
5
   General Insolvency Counsel for
6  Debtor and Debtor-in-Possession

7  MADISON SPACH – State Bar No. 63218
   MICHAEL D. CAPALDI – State Bar No. 122417
8  **SPACH CAPALDI & WAGGAMAN, LLP**
   4675 MacArthur Court, Suite 550
9  Newport Beach, CA 92660
   Telephone: (949) 852-0710
10 Facsimile: (949) 852-0714

11 Special Litigation Counsel for
   Debtor and Debtor-in-Possession
12

13

14          **UNITED STATES BANKRUPTCY COURT**

15          **CENTRAL DISTRICT OF CALIFORNIA**

16                  **SANTA ANA DIVISION**

17 In re                              Case No. 8:11-bk-17998 RK

18 ONE PELICAN HILL ROAD              Chapter 11 Proceeding
   NORTH, L.P., a California limited
19 partnership,                       **DEBTOR'S OPPOSITION TO MOTION FOR**
                                      **RELIEF FROM STAY; MEMORANDUM OF**
20          Debtor and               **POINTS AND AUTHORITIES AND**
                                      **DECLARATION OF COREY**
21          Debtor-in-Possession.    **GULBRANSON IN SUPPORT THEREOF**

22                                   **[DECLARATIONS OF ROB GIEM,**
                                      **MICHELE QUEYREL AND JOHN**
23                                   **MCMONIGLE IN SUPPORT THEREOF**
                                      **FILED CONCURRENTLY]**
24

25                                   DATE:     November 15, 2011
                                     TIME:     10:30 a.m.
26                                   PLACE:    Ctrm. "5D"

27

28

MAINDOCS-#168902-v1-OnePelican_OppToRFS.DOC

# TABLE OF CONTENTS

**PAGE**

I.    SUMMARY OF ARGUMENTS.................................................................. 2
      A.    Lack of Standing.................................................................... 2
      B.    OneWest's Motion Is Procedurally Deficient ............................... 3
      C.    No Adequate Protection Issues Exists ........................................ 3
      D.    Equity Exists in the Property .................................................... 3
      E.    OneWest's Lien and Claim Should Be Equitably Subordinated.................. 4

II.   SUMMARY OF MATERIAL FACTS ....................................................... 5
      A.    The Debtor.......................................................................... 5
      B.    The Project.......................................................................... 5
      C.    The Debtor's Construction Loan ................................................ 5
      D.    La Jolla's Default Under the Terms of the Construction Loan ..................... 7
      E.    The Debtor's Sale Effort.......................................................... 8
      F.    The Value of the Project.......................................................... 9
      G.    The Reorganization Concept ..................................................... 10

III.  ONEWEST LACKS STANDING TO PURSUE THE MOTION
      BASED UPON THE EVIDENCE .......................................................... 10

IV.   ANY INTEREST THAT ONEWEST HAS IN THE PROJECT IS
      ADEQUATELY PROTECTED............................................................. 11

V.    THE DEBTOR HAS EQUITY IN THE PROJECT AND IT IS
      NECESSARY FOR AN EFFECTIVE REORGANIZATION................................. 12

VI.   EQUITY EXISTS WHEN THE DEBTOR'S EQUITABLE
      SUBORDINATION CLAIM IS TAKEN INTO ACCOUNT ................................. 14
      A.    Equitable Subordination Must Be Weighed in the Equity
            Assessment ...................................................................... 14
      B.    The Debtor Has a Strong Equitable Subordination Claim ........................... 18

VII.  CONCLUSION ............................................................................. 19

MAINDOCS-#168902-v1-OnePelican_OppToRFS.DOC

**TABLE OF AUTHORITIES**

**PAGE**

**CASES**

*Adams v. Madison Realty & Dev., Inc.,*
    853 F.2d 163 (3d Cir. 1988) ............................................................................10

*Adler v. Sargent,*
    109 Cal. 42 (1895) ...............................................................................................2

*Carpenter v. Longan,*
    83 U.S. 271 (1872) ..............................................................................................2

*Henley v. Hotaling,*
    41 Cal. 22 (1871) .................................................................................................2

*In re 9281 Shore Road Owners Corp ,*
    187 B.R. 837 (E.D.N.Y. 1995) .........................................................................17

*In re Bialac,*
    694 F.2d 625 (9th Cir. 1982) ..............................................................4, 12, 14

*In re Bluridg Farms, Inc.,*
    93 B.R. 648 (Bankr.S.D.Iowa 1988) ................................................................14

*In re Bonner Mall Partnership,*
    2 F.3d 899 (9th Cir 1993) .................................................................................13

*In re Century Inv. Fund VII, Ltd. Partnership,*
    96 B.R. 884 (Bankr. E.D. Wis. 1989) ..............................................................11

*In re Dino & Artie's Automatic Transmission Co., Inc.,*
    68 B.R. 264 (Bankr.S.D.N.Y. 1986) ................................................................15

*In re Elk Creek Salers, Ltd.,*
    286 B.R. 387 (Bankr.W.D.Mo.2002) ...............................................................14

*In re First Alliance Mortg. Co.,*
    471 F.3d 977 (9th Cir. 2006) ............................................................................18

*In re Fontes,*
    2011 WL 3300933 (9th Cir. BAP 2011) .............................................................2

*In re Grand Traverse Development Co. Ltd. Partnership,*
    150 B.R. 176 (N.D.N.Y. 1992) .........................................................................13

MAINDOCS-#168902-v1-OnePelican_OppToRFS.DOC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

### (Continued)

PAGE

*In re Johnson,*
   90 B.R. 973 (Bankr. D. Minn. 1988)...............................................................11

In *re Kaplan Breslaw Ash, LLC,*
   264 B.R. 309, fn. 64 (Bankr. S.D.N.Y. 2001) .................................................4, 14

*In re Ledgemere Land Corp.,*
   116 B.R. 338 (Bankr. D.Mass. 1990) .................................................................11

*In re Lockard,*
   234 B.R. 484 (Bankr.W.D.Mo.1999) ................................................................14

*In re Mr. R's Prepared Foods, Inc.,*
   251 B.R. 24 (Bankr. D. Conn. 2000)....................................................4, 15, 16

*In re Mulnix,*
   54 B.R. 481 (Bankr.N.D.Iowa 1985).................................................................14

*In re Pacific Exp.,*
   69 B.R. 112 (9th Cir. BAP 1986) .......................................................................18

*In re Poughkeepsie Hotel Assoc. Joint Venture,*
   132 B.R. 287 (Bankr. S.D.N.Y. 1991).........................................4, 14, 15, 16

*In re SM 104 Ltd.,*
   160 B.R. 202 (Bankr.S.D.Fla.1993) ..................................................................14

*In re Springs Hospitality,*
   2006 WL 2458679, 9 (Bankr.D.Colo. 2006).............................................4, 15, 16

*In re Universal Farming Industries,*
   873 F .2d 1334 (9th Cir. 1989) ...........................................................................18

*In re Waste Alternatives, Inc.,*
   71 B.R. 147 (Bankr.M.D.Fla. 1994) ..................................................................17

*In re Weisband,*
   427 B.R. 13 (Bankr. D. Ariz. 2010) .....................................................................2

*Seidell v. Tuxedo Land Co.,*
   216 Cal. 165 (1932)..............................................................................................2

*United States v. Timbers of Inwood Forest,*
   484 U.S. 365 (1988) ................................................................................11, 12, 13

MAINDOCS-#168902-v1-OnePelican_OppToRFS.DOC

# TABLE OF AUTHORITIES

### (Continued)

**PAGE**

**STATUTES**

11 U.S.C. § 362(d)..................................................................................................14, 15, 19
11 U.S.C. § 362(d)(1) ............................................................................................................2
11 U.S.C. § 362(d)(2) ................................................................................2, 13, 14, 15
11 U.S.C. § 363(e)..................................................................................................................3
11 U.S.C. § 510(c)..................................................................................4, 8, 15, 16
11 U.S.C. § 1129..................................................................................................................13
Cal. Civ. Code § 2936 ..........................................................................................................2
Cal. Comm. Code. §3201 ..................................................................................................10
Cal. Comm. Code § 3202...................................................................................................10

1  One Pelican Hills Road North, L.P. (the "Debtor") hereby submits the following

2  *Opposition* to that certain *Motion for Relief From The Automatic Stay* (the "Motion") filed by

3  OneWest Bank, FSB ("One West"). This Opposition is supported by the concurrently filed

4  declarations of Corey Gulbranson, Rob Giem, Michele Queyrel and John McMonigle.

I.

### SUMMARY OF ARGUMENTS

7  In the Motion, OneWest seeks relief from the automatic stay to foreclose upon the

8  disputed lien and claim that it purportedly holds against the Debtor's primary asset, One Pelican

9  Hill Road North (the "Project"). In support of the Motion, OneWest contends that it is entitled to

10  relief under 11 U.S.C. § 362(d)(1) due to an alleged lack of adequate protection, and under 11

11  U.S.C. § 362(d)(2) due to an alleged lack of equity. As more fully explained herein, the Motion

12  should be denied for the following reasons:

13  **A.    Lack of Standing.**

14  The promissory note, loan agreement and deed of trust that OneWest has attached to the

15  Motion were all made in favor of La Jolla Bank, FSB ("La Jolla"). Although OneWest contends

16  that it is the assignee of La Jolla's rights, the only document attached to the declaration supporting

17  this contention is a *Corporation Assignment of Deed of Trust* ( Exhibit "3" to the Motion). This

18  document does not establish that OneWest is the holder of the relevant note. [1] Until OneWest

19  produces the original of the note, with evidence confirming that it was assigned to OneWest, it

20  lacks standing. *See, In re Fontes*, 2011 WL 3300933 (9th Cir. BAP 2011); *In re Weisband*, 427

21  B.R. 13, 21 (Bankr. D. Ariz. 2010) ("In this case, however, the evidence does not demonstrate that

22  the Note and DOT were transferred to the Trust, and, without that evidence, there is no

23  demonstration that GMAC is the servicer of the Note.").

---

[1] "An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity." *Carpenter v. Longan*, 83 U.S. 271, 274 (1872); *accord Henley v. Hotaling*, 41 Cal. 22, 28 (1871); *Seidell v. Tuxedo Land Co.*, 216 Cal. 165, 170 (1932); Cal. Civ. Code §2936. Therefore, if on party receives the note and another receives the deed of trust, the holder of the note prevails regardless of the order in which the interests were transferred. *Adler v. Sargent*, 109 Cal. 42, 49-50 (1895).

MAINDOCS-#168902-v1-OnePelican_OppToRFS.DOC

**B.   OneWest's Motion Is Procedurally Deficient.**

As more full explained herein, the Construction Deed of Trust ("Construction DOT") that OneWest contends that it holds against the Project appears to secure two obligations: The obligations in the Construction Note and Construction Loan, and the obligations in guarantee that John McMonigle apparently granted to La Jolla as additional collateral for the Construction Loan. Given this circumstance, OneWest cannot seek relief from stay to foreclose on the Project in the Debtor's case without concurrently seeking relief from stay in McMonigle's pending Chapter 7 case, which OneWest has failed to do. Proceeding in one case, but not in both, accomplishes nothing. Moreover, from a notice perspective, the Trustee in the McMonigle case should be fully apprised of these proceeding.

**C.   No Adequate Protection Issues Exists.**

As long as the Project has not declined in value since June 6, 2011, or, if such a decline has occurred, a sufficient equity cushion exists to protect the affected lender, then OneWest's disputed interest in the Project remains adequately protected.[2] Here, both criteria are satisfied. The evidence establishes that comparable properties have not declined in value since June of 2011, and that a sufficient equity cushion exists.[3]

**D.   Equity Exists in the Property.**

OneWest's $14.7 million dollar appraisal is fatally flawed. Although the appraiser acknowledges that the Project is unique (the largest property in Newport Coast), he intentionally skews his analysis to achieve the goal of his employer (a showing of a lack of equity). By way of

---

[2] In *United States v. Timbers of Inwood Forest*, 484 U.S. 365, 372 (1988), the "interest in property" entitled to adequate protection under 11 U.S.C. §363(e) is no more or less than the "value of the collateral" that is subject to the secured creditor's lien. Under the *Timbers'* holding, a debtor is merely required to show that the secured creditor's collateral will not decline in value *prospectively* to establish "adequate protection." *See also; In re Ledgemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D.Mass. 1990) (so long as the receivables being collected and used by the debtor are being replaced by sufficient new receivables in which the creditor is granted a security interest, the creditor is adequately protected); *In re Johnson*, 90 B.R. 973, 978 (Bankr. D. Minn. 1988) (since value of the collateral has not declined, the bank is not impaired and is not entitled to receive adequate protection payments); *In re Century Inv. Fund VII, Ltd. Partnership*, 96 B.R. 884, 887 (Bankr. E.D. Wis. 1989) (where value appears to be stable, creditor is not entitled to adequate protection payments).

[3] OneWest's appraiser contends that average prices have declined in calendar 2011 from calendar year 2010. Although this is not in fact the case when the focus is on Newport Coast, this evidence is irrelevant. The relevant period is from June 6, 2011 to the present date and there is no evidence before the Court even suggesting that declined occurred within this time frame. To the contrary, the evidence submitted herewith establishes stability in pricing.

MAINDOCS-#168902-v1-OnePelican_OppToRFS.DOC

1    example, seven of the nine purported "comparables" chosen by the appraiser have *only ten*

2    *percent (on average) of the Project's land area.* The eighth is a bank foreclosure and the ninth is

3    fifteen miles inland. In sum, none of the purported "comparables" relied upon the OneWest's

4    appraiser are in fact comparable. As more fully addressed in the Declarations of Rob Giem and

5    Corey Gulbranson, the fair market value of the Project is in excess of $25.0 million. The actual

6    value over and above this floor is difficult to assess for a very simple reason – the Project is

7    unique, as OneWest's appraiser acknowledges.

8          **E.**     **OneWest's Lien and Claim Should Be Equitably Subordinated**.

9          Numerous courts, including the Ninth Circuit, hold that, on a motion for relief from the

10    automatic stay, a court should consider affirmative defenses and counterclaims that directly

11    involve the validity or priority of a movant's security interest and/or the debtor's equity in the

12    property. *In re Bialac*, 694 F.2d 625, 627 (9th Cir. 1982) ("When a debtor's affirmative defenses

13    and counterclaims [to the creditor's motion for relief from stay] directly involve the question of the

14    debtor's equity, they should be heard in the stay proceeding."); In *re Kaplan Breslaw Ash, LLC*,

15    264 B.R. 309, 327 fn 64 (Bankr. S.D.N.Y. 2001) (same); *In re Poughkeepsie Hotel Assoc. Joint*

16    *Venture*, 132 B.R. 287,291 (Bankr. S.D.N.Y. 1991). As more fully set forth herein, the Debtor has

17    an ironclad equitable subordination claim against OneWest, and there is ample authority

18    confirming that this defense must be considered as a part of any relief from stay analysis. See *In re*

19    *Poughkeepsie Hotel Assoc. Joint Venture*, 132 B.R. 287,291 (Bankr. S.D.N.Y. 1991) ("The

20    affirmative defense of equitable subordination under Code § 510(c) may properly be asserted as a

21    defense to a motion for relief from stay."); *In re Springs Hospitality*, 2006 WL 2458679, 9

22    (Bankr.D.Colo. 2006) ("Equitable subordination is a defense to a motion for relief from the

23    automatic stay. In appropriate circumstances, bankruptcy courts will deny a motion for relief from

24    stay for the purpose of litigating the subordination issue. This is proper because the subordination

25    issue goes to the question of the Debtor's equity in its property and the moving creditor's status as a

26    secured creditor."); *In re Mr. R's Prepared Foods, Inc.*, 251 B.R. 24, 28 (Bankr. D. Conn. 2000).

27          The Debtor's equitable subordination claim is simple and irrefutable: *Due to its own*

28    *insolvency*, La Jolla failed to fund it obligations under the Construction Loan, thereby breaching its

1  contractual obligations. La Jolla's insolvency was confirmed by the FDIC's takeover on February

2  19, 2010.  OneWest's failure to cure this breach, denies OneWest recourse and it justifies the

3  subordination of OneWest's alleged lien and claim to the rights of all other creditors who were

4  damaged by this breach.

II.

**SUMMARY OF MATERIAL FACTS**

7  **A.    The Debtor**.

8      The Debtor is a California limited partnership that was formed to build a world class

9  residential estate on a property located in the exclusive "Newport Coast" neighborhood of

10  Newport Beach, California. McMonigle was the original general partner of the Debtor and he was

11  also the prime mover behind the investment concept.

12  **B.    The Project**.

13      Consistent with McMonigle's business plan, the Debtor acquired a 12.5 acre parcel of land

14  in Newport Coast, and in 2007 moved forward with the development of a series of improvements

15  onsite. As of the June 6, 2011 Petition Date, the Debtor had constructed a substantially complete

16  17,000 square foot Italianate villa, a man-made lake, stables, terraced gardens, a pool area, a wine

17  cave on site and surrounded the entire estate with a wall. The wall opens to the outside through a

18  large gate that has a one thousand square foot gatehouse. As more full explained herein, the

19  Project was not fully completed due to La Jolla's breach of its obligations under the Construction

20  Loan, on account of La Jolla's own insolvency.

21  **C.    The Debtor's Construction Loan**.

22      On April 17, 2007, the Debtor and La Jolla entered into that certain Construction Loan

23  Agreement (the "Construction Loan"), Promissory Note (the "Construction Note") in the original

24  principal amount of $21,600,000, and Construction Deed of Trust (the "Construction DOT").

25  Pursuant to the terms of the Construction Loan and Construction Note, La Jolla agreed to fund the

26  construction of the improvements to the Project up to the principal balance of $21,600,000.

27      On the first page of the Construction Loan, under the subtitle "Guaranties", McMonigle is

28  listed as the sole guarantor of the obligations in the Construction Loan. The imposition of

-5-

1  guarantee liability upon McMonigle by the Construction Loan is relevant to this Opposition for

2  the following reason. The Construction DOT states:

3
> This Deed Of Trust, Including The Assignment Of Rents And Security Interest
> In The Rents And Personal Property Is Given To Secure (A) **Payment Of The**
4
> **Indebtedness** And (B) Performance Of Any And All Obligations Of The Trustor
5  > Under The Note, The Related Documents, And This Deed Of Trust. This Deed
> Of Trust Is Given And Accepted On The Following Terms:

6  (Gulbranson Decl., Ex. "3", P. __) (emphasis added). The terms "INDEBTEDNESS" is defined

7  on page 9 of each Deed of Trust as follows:

8
9
> The word "indebtedness" means all principal, interest, and other amounts, costs
> and expenses payable under the Note **or Related Documents**, together with all
10 > renewals of, extensions of, modifications of, consolidations of and substitutions
> for the Note or Related Documents and any amounts expended or advanced by
11 > Lender to discharge Trustor's obligations or expenses incurred by Trustee or
> Lender to enforce Trustor's obligations under this Deed of Trust, together with
12 > interest on such amounts as provided in the Deed of Trust.

13 (Gulbranson Decl., Ex. "3", P. __) (emphasis added). Finally, the term "Related

14 Documents" used in the above definition is defined as follows:

15
> The words "Related Documents" mean all promissory notes, credit agreements,
16 > loan documents, environmental agreements, security agreements, mortgages,
> deeds of trust, security deeds, collateral mortgages, **and all other instruments,**
17 > **agreements and documents, whether now or hereafter existing, executed in**
> **connection with the Indebtedness.**
18
19 (Gulbranson Decl., Ex. "3", P. __) (emphasis added).

20       The foregoing language, when read together, establishes the following. First, the Deed of

21 Trust secures all obligations falling with the defined term "INDEBTEDNESS" and this term

22 includes "all amounts" payable under the "RELATED DOCUMENTS." The term "RELATED

23 DOCUMENTS" includes, per its definition, "all...agreements and documents... executed in

24 connection with the Indebtedness." It is beyond question that the Guarantee was executed "in

25 connection with the Indebtedness." As more fully explained in the Legal Authorities section

26 hereof, this definitional sequence means that the obligations in the McMonigle Guarantee are

27 secured by the same real property as the Construction Loan, which gives rise to stay implications

28 in McMonigle's case.

**D.    La Jolla's Default Under the Terms of the Construction Loan**.

In the summer of 2009, La Jolla and the Debtor into that certain Change in Terms Agreement dated July 1, 2009. (Gulbranson Decl., Ex. "4", P. ___). In this modification to the Construction Loan the parties agreed that the interest (payments) only "construction period" under the terms of the Construction Loan would be extended for nine months from October 1, 2009, and the Debtor would deposit an additional $1.2 million to be used for construction. *Id*. Although these funds were the Debtors, it was agreed that disbursement would be monitored by "funds control" within La Jolla to insure that they were in fact used for the Project. *Id*.

Pursuant to the *Change In Terms Agreement*, the parties were agreeing that the Construction Loan was in compliance and that both sides were obligated to continue to perform thereunder. Unfortunately, La Jolla failed to comply with its side of the bargain. Attached to the Gulbranson Declaration as Exhibit "5" is a series of emails from the chief financial officer of the McMonigle Residential Group (agent for the general partner) detailing La Jolla's failure to fund it obligations under the terms of the Construction Loan. At the time these funding failures occurred, La Jolla was in a financial free-fall and it was ultimately seized by the FDIC in February of 2010.

The Debtor believes that evidence generated from discovery will show that La Jolla lacked the funds to meet its obligations under the Construction Loan and was not in a position to allow the Debtor to draw down on its own funds, since this would further exacerbate La Jolla's internal funding crisis. The Debtor believes this evidence with further show that La Jolla hid the truth from the Debtor regarding its inability to perform in order to avoid liability for this default.

La Jolla's breach of its contractual obligations, and it failure to admit that it lacked the ability to fund, for six months, had the following devastating impact upon the Debtor:

    1.    The process of completing the Project, which is a complicated and coordinated enterprise, was delayed and ultimately it became impossible;

    2.    The contractor and subcontractors providing good and services to the Project continued to perform work and provide materials based upon La Jolla's false representations regarding funding;

1    3.    The Debtor suffered millions in damages in the form of costs,

2    interest charges, penalties and lost sales value, through La Jolla's breach and it

3    was ultimately forced into Chapter 11 when OneWest, instead of curing La Jolla's

4    default, sought to profit from the same through foreclosure; and

5    4.    The Debtor, being unaware of La Jolla's insolvency, deferred

6    seeking funds from other financial sources who could have stepped in to mitigate

7    its damages.

8    The total compensatory damages suffered by the Debtor due to La Jolla's and OneWest's

9    breaches exceed seven million dollars. As more fully explained herein, these circumstances

10    warrant the subordination of the claim and lien asserted by OneWest, as the purported successor-

11    in-interest to La Jolla, pursuant to 11 U.S.C. § 510(c).

12    **E.    The Debtor's Sale Effort**.

13    In the Motion, OneWest contends that the Debtor's efforts to sell the Project have been

14    unsuccessful and consequently relief from stay should be granted. In support of this assessment,

15    OneWest contends that the Debtor estimated it could sell the Project in sixty days. This

16    assessment is baseless.

17    The Debtor never promised that it would sell the Project in two months. It stated that it

18    would market the Project for sixty days to buyers throughout the world after it secured a "stalking

19    horse" bidder in order to generate the highest price possible. Given the fact that the Project is

20    unique and expensive, and the Debtor is attempting to sell it during one of the worst economic

21    periods in United States' history, a six to nine month sale period is reasonable. Unfortunately, *due*

22    *to OneWest's interference* (which was presumably designed to create a basis for the above

23    argument), the Debtor only secured the services of HOM Realty Group in late August of 2011.

24    Accordingly, the Debtor's sale effort is only now getting off the ground, during the slowest part of

25    the sales season.

26    As the plan of reorganization and disclosure statement being filed concurrently herewith

27    establish, the Debtor is moving this case forward to a definitive conclusion that will yield the best

28    possible result for all creditors hold allowed claims. This process should be allowed to proceed

MAINDOCS-#168902-v1-OnePelican_OppToRFS.DOC

1  without interference by a creditor whose prepetition breach was the cause of the Debtor's financial

2  problems.

3      **F.**    **The Value of the Project**.

4      In the appraisal prepared by OneWest, the appraiser states: "The property is unique as it is

5  a very large property on a large land area for Newport Beach." Yet, instead of seeking out similar

6  or "comparable" properties in his valuation effort, OneWest's appraiser intentionally shoots for

7  the bottom, selecting a series of properties that are anything but comparable.

8      The summary table below illustrates vast gulf between the properties selected by

9  OneWest's appraiser as purported comparables and the Project:

|  | 1 Pelican | Comp 1 | Comp 2 | Comp 3 | Comp 4 |  |
|---|---|---|---|---|---|---|
| Land (sq. ft.) | 522720 | 26888 | 22183 | 29541 | 22888 |  |
| % Comparison | 100% | 5% | 4% | 6% | 4% |  |

|  | 1 Pelican | Comp 5 | Comp 6 | Comp 7 | Comp 8 | Comp 9 |
|---|---|---|---|---|---|---|
| Land (sq. ft.) | 522720 | 517928.4 | 28477 | 418176 | 40430 | 69696 |
| % Comparison | 100% | 99% | 5% | 80% | 8% | 13% |

15  Seven of the so-called "comps" above have *90% less acreage* than the Project, and between[4] 15%

16  and 44% less interior living space, excluding Comp 8. The only two properties whose land area is

17  even remotely comparable to the Project's land are Comp 5 and Comp 7. However, here again no

18  reasoned comparison exists: *Comp 5 is a bank foreclosure and Comp 7 is fifteen miles inland.*

19  In sum, the properties selected by OneWest's appraiser are not even remotely comparable to the

20  Project, and consequently any valuation indication derived from this analysis should be rejected.[5]

21      As the Declarations of Rob Giem and Corey Gulbranson confirm, the value of the Project,

22  if marketed for a commercially reasonable marketing period is in excess of $25 million. The delta

23  in excess of this sum could $5 million or it could be $10 million, due to the uniqueness of the

24  Project and the current problematic state of the economy.

[4] The Project includes a 1,100 square foot gatehouse and a separate wine cave that are not counted in the square foot analysis.

[5] OneWest's appraiser should have stayed with in his core assessment and looked for other "unique" properties for value comparatives. Moreover, as Mr. Donahue, the appraiser being employed by the Debtor correctly notes, in developing a value solution for an iconic property of this nature, the search for market comparatives should have covered a larger area, since a buyer of a property of this kind would consider properties ranging from Santa Barbara to San Clemente.

MAINDOCS-#168902-v1-OnePelican_OppToRFS.DOC

1    **G.    The Reorganization Concept**.

2    As explained in the concurrently filed plan and disclosure statement, the objective of the

3    Chapter 11 is to market and sell the Project for the highest price obtainable through a commercial

4    auction. This auction will occur in the Spring after a commercially reasonable marketing period. If

5    this auction succeeds, the Debtor believes that the claims of all creditors holding allowed claims

6    will be paid in full.

7                                              **III.**

8                          **ONEWEST LACKS STANDING TO PURSUE**

9                          **THE MOTION BASED UPON THE EVIDENCE**

10    In the Motion, OneWest's declarant contends that OneWest received title to the

11    Construction Loan and Note through an assignment from the FDIC. In support of this contention,

12    OneWest attaches a Corporation Assignment of Deed of Trust (the "DOT Assignment"). The

13    assigning party under the DOT Assignment is the FDIC. This is not sufficient for the following

14    reason: There is no evidence before the Court establishing that OneWest is a "holder" of the

15    Construction Note.[6]

16    The DOT Assignment generically states that the assignment therein includes the "note(s)"

17    referenced in the underlying deed of trust. The original of the Construction Note reflecting the

18    transfer is not before the Court. Since the FDIC is not warranting anything in the DOT

19    Assignment, any number of other parties could have title to the Construction Note.[7] Given these

20    facts, production of the original of the Note is mandated by the Best Evidence Rule, since only this

21    production will confirm possession and the lack of a transferring endorsement. *See Adams v.*

22    *Madison Realty & Dev., Inc.*, 853 F.2d 163, 168 (3d Cir. 1988) ("From the maker's standpoint,

23    therefore, it becomes essential to establish that the person who demands payment of a negotiable

24    note, or to whom payment is made, is the duly qualified holder. Otherwise, the obligor is exposed

25    _____

[6] Cal.Comm. Code §3201 ("Negotiation" means a transfer of possession, whether voluntary or involuntary, of an
26    instrument by a person other than the issuer to a person who thereby becomes its holder.  (b) Except for negotiation by
a remitter, if an instrument is payable to an identified person, negotiation requires transfer of possession of the
27    instrument and its indorsement by the holder. If an instrument is payable to bearer, it may be negotiated by transfer of
possession alone."); Cal. Comm. Code § 3202.
28    [7] La Jolla could have previously assigned or participated the Note to any number of third parties before the FDIC
seized the bank, and the FDIC would have had knowledge of these facts, unless it had the original of the Note.

1   to the risk of double payment, or at least to the expense of litigation incurred to prevent duplicative

2   satisfaction of the instrument. These risks provide makers with a recognizable interest in

3   demanding proof of the chain of title. Consequently, plaintiffs here, as makers of the notes, may

4   properly press defendant to establish its holder status.")

5   **IV.**

6   **ANY INTEREST THAT ONEWEST HAS IN THE**

7   **PROJECT IS ADEQUATELY PROTECTED**

8      In *United States v. Timbers of Inwood Forest*, 484 U.S. 365, 372 (1988), the "interest in

9   property" entitled to adequate protection under 11 U.S.C. §363(e) is no more or less than the

10  "value of the collateral" that is subject to the secured creditor's lien. Under the *Timbers'* holding,

11  a debtor is merely required to show that the secured creditor's collateral will not decline in value

12  *prospectively* to establish "adequate protection." *See also; In re Ledgemere Land Corp.,* 116 B.R.

13  338, 343 (Bankr. D.Mass. 1990) (so long as the receivables being collected and used by the debtor

14  are being replaced by sufficient new receivables in which the creditor is granted a security interest,

15  the creditor is adequately protected); *In re Johnson*, 90 B.R. 973, 978 (Bankr. D. Minn. 1988)

16  (since value of the collateral has not declined, the bank is not impaired and is not entitled to

17  receive adequate protection payments); *In re Century Inv. Fund VII, Ltd. Partnership*, 96 B.R.

18  884, 887 (Bankr. E.D. Wis. 1989) (where value appears to be stable, creditor is not entitled to

19  adequate protection payments).

20      In this case, there is no evidence before the Court establishing that the Project is declining

21  in value. To the contrary, the evidence filed herewith confirms, at a minimum, that the values are

22  at least stable and may well be increasing. The per square foot sales graph attached to the Giem

23  Declaration bears this out, indicating a pricing increase from July of 2011 to this month, and

24  indicating that PSF prices are higher today in the applicable market than they were in June of

25  2011.

26      The only evidence submitted by OneWest in support of its claim that the Project has

27  declined in value is a generic reference in its appraiser declaration to a year-over-year decline

28

-11-

1    from 2010 to 2011.[8] This is irrelevant. The applicable period is the post-petition time frame and as

2    indicated by the Giem Declaration, there is no evidence of decline during this period. At worst the

3    applicable Newport Coast submarket it stable.

4                                                    V.

5                    **THE DEBTOR HAS EQUITY IN THE PROJECT AND**

6                    **IT IS NECESSARY FOR AN EFFECTIVE REORGANIZATION**

7            The Ninth Circuit has held that relief from stay cannot be granted under Section 362(d)(2)

8    of the Bankruptcy Code if the debtor has equity in the property. *In re Bialac*, 712 F.2d 426, 432-

9    433 (9th Cir. 1983) ("HIC has at best shown that, under *one* interpretation of the note, James Bialac

10   has no present equity in it. It is equally plausible that he does. The question is currently being

11   litigated. The bankruptcy court was justified in refusing to duplicate the efforts of another court.").

12   The burden of establishing a lack of equity is on the lender. *Id.* If this burden is not satisfied, then

13   relief must be denied.

14           As explained above, the inherent defect in OneWest's appraisal is that it presents anything

15   but a "market value." The market value of the Project can only be fairly assessed by taking into

16   consideration the fact it offers a buyer two characteristics that are all but non-existent in the

17   relevant market area: twelve acres of space and the privacy of a private compound. No other

18   property or land configuration in Newport Beach offers these critical attributes in this abundance.

19   The buyer of this property can be assured of privacy, safety and exclusivity within one of the

20   world most premier coastal communities. Wealthy buyers and dignitaries throughout the world

21   will pay a premium for these attributes if the Debtor is allowed the time to properly market the

22   Project. As the Declarations of Rob Giem and Corey Gulbranson confirm, these attributes place

23   the market value of the Property at in excess of $25 million, leaving equity for other creditors.

24           In the *Bialac* case, the Ninth Circuit made it clear that a creditor's summary interpretation

25   of value should not be accepted by the Court. If this Court is not inclined to deny OneWest's

26   Motion outright, then this case should be set over for a full valuation trial on the merits. 712 F.2d

27

28   [8] OneWest's contention that its failure to receive payments is somehow relevant to the adequate protection is the same
     argument that was made and rejected by a unanimous Supreme Court in *Timbers*.

MAINDOCS-#168902-v1-OnePelican_OppToRFS.DOC

1   426, 432-433 (9th Cir. 1983) ("HIC has at best shown that, under *one* interpretation of the note,

2   James Bialac has no present equity in it. It is equally plausible that he does. The question is

3   currently being litigated. The bankruptcy court was justified in refusing to duplicate the efforts of

4   another court.").

5         The Ninth Circuit's decision in *In re Bonner Mall Partnership*, 2 F.3d 899 (9th Cir 1993),

6   is cited primarily for its approval of the "new value" exception to the absolute priority rule.

7   However, *Bonner Mall* also provided critical guidance to the Bankruptcy Judges in this circuit

8   regarding the burden of proof applicable in relief from stay hearings - because *Bonner Mall* was a

9   relief from stay case involving a shopping center that by agreement, had no equity.  In the critical

10  part of this opinion, the Ninth Circuit stated:

> As noted above, the precise issue posed by Bancorp's motion for relief from stay
> is not whether Bonner's plan will ultimately be confirmed under Section 1129
> **but whether there is a reasonable possibility that it can be confirmed within
> a reasonable time.**  That is all Bonner need show to defeat Bancorp's Section
> 362(d)(2) motion.  <u>United Sav. Ass'n of Texas v. Timbers of Inwood Forest
> Assoc., Ltd.</u>, 484 U.S. 365, 98 L.Ed. 2d 740, 108 S.Ct. 626 (1988).  **It need not
> put forth evidence of a type it would be required to produce in a
> confirmation hearing.**

16  2 F.3d at 919 (emphasis added). The United States Supreme Court has also weighed in on the

17  burden imposed by Section 362(d)(2) holding that the burden imposed upon a debtor in opposing

18  a motion for relief from stay under Section 362(d)(2) is lower during the early part of the case

19  (i.e. the first four months), than it is when the case has been pending longer.  *United Sav. Ass'n.*

20  *v. Timbers of Inwood Forest, Assocs., Ltd.,* 484 U.S. 365, 376, 108 S.Ct. 626, 98 L.E.D. 2d 740

21  (1988); *See also, In re Grand Traverse Development Co. Ltd. Partnership*, 150 B.R. 176

22  (N.D.N.Y. 1992)(In the early stages of a Chapter 11, the debtor need only show that

23  reorganization is "plausible" to avoid relief from the automatic stay).

24        In this case, not only is the Debtor's case in its early stages, here the Debtor has filed a

25  plan of reorganization and a comprehensive supporting disclosure statement.  These documents

26  are accompanied by detailed financial projections that explain how, when and at what prices the

27  Debtor's asset will be sold, and what creditors can expect to receive through the Plan.  The

28

MAINDOCS-#168902-v1-OnePelican_OppToRFS.DOC

1   evidence filed herewith confirms that these assumptions are reasonable.[9] In summary, the

2   evidence before the Court establishes that the Debtor has filed a viable and confirmable plan of

3   reorganization. At this stage in the case, no more is required under the above authorities to justify

4   the denial of relief from stay pursuant to 11 U.S.C. §362(d)(2).

5                                                      VI.

6                           **EQUITY EXISTS WHEN THE DEBTOR'S**

7          **EQUITABLE SUBORDINATION CLAIM IS TAKEN INTO ACCOUNT**

8       **A.    Equitable Subordination Must Be Weighed in the Equity Assessment.**

9           Numerous courts, including the Ninth Circuit, hold that, on a motion for relief from the

10  automatic stay, a court should consider affirmative defenses and counterclaims that directly

11  involve the validity of a movant's security interest and/or the debtor's equity in the property.

12  "When a debtor's affirmative defenses and counterclaims [to the creditor's motion for relief from

13  stay] directly involve the question of the debtor's equity, they should be heard in the stay

14  proceeding." *In re Bialac*, 694 F.2d 625, 627 (9th Cir. 1982); *In re Kaplan Breslaw Ash, LLC*, 264

15  B.R. 309, 327 fn 64 (Bankr. S.D.N.Y. 2001) (same); *In re Poughkeepsie Hotel Assoc. Joint*

16  *Venture*, 132 B.R. 287,291 (Bankr. S.D.N.Y. 1991); *In re Topgallant Lines, Inc.*, 1993 WL

17  13004125, *2 (Bankr.S.D.Ga. 1993). Indeed, the text of 11 U.S.C. § 362(d) dictates consideration

18  of a challenge to the validity of the creditor's lien on a motion for relief from stay. "[W]hen the

19  debtor's defense to a motion for relief from the automatic stay contests the validity of the creditor's

20  lien ... the court should entertain this issue because it goes to the heart of the creditor's interest in

21  the property. This is so because 11 U.S.C. § 362(d) expressly provides that relief from the

22  automatic stay with respect to property of the estate may be sought by 'a party in interest.' If the

23  moving creditor does not have a lien on the property in question, it follows that the creditor is not

24

25

26  [9] See *In re Mulnix*, 54 B.R. 481, 484 (Bankr.N.D.Iowa 1985) (Pelofsky, J.) (finding 20-year term not unreasonable
    when collateral is real estate); *In re SM 104 Ltd.*, 160 B.R. 202, 231 (Bankr.S.D.Fla.1993) (collecting cases). The ability
27  to pay secured claims over a number of years is not limited only to long-term installment obligations, but also applies to
    short-term obligations. *In re Elk Creek Salers, Ltd.*, 286 B.R. 387, 390 (Bankr.W.D.Mo.2002). In *In re Bluridg Farms,*
28  *Inc.*, 93 B.R. 648, 654 (Bankr.S.D.Iowa 1988), the court approved a 7-year repayment term in a Chapter 12 plan for a
    claim secured by chattels. In *In re Lockard*, 234 B.R. 484, 496 (Bankr.W.D.Mo.1999).

1    'a party in interest' as to such property." *In re Dino & Artie's Automatic Transmission Co., Inc.*, 68

2    B.R. 264, 268 (Bankr.S.D.N.Y. 1986).

3        A number of courts have specifically held that an equitable subordination claim against a

4    secured claim must be taken into consideration in the "equity" analysis under Section 362(d)(2).

5    See *In re Poughkeepsie Hotel Assoc. Joint Venture*, 132 B.R. 287, 291 (Bankr. S.D.N.Y. 1991)

6    ("The affirmative defense of equitable subordination under Code § 510(c) may properly be

7    asserted as a defense to a motion for relief from stay."); *In re Springs Hospitality*, 2006 WL

8    2458679, 9 (Bankr.D.Colo. 2006) ("Equitable subordination is a defense to a motion for relief

9    from the automatic stay. In appropriate circumstances, bankruptcy courts will deny a motion for

10   relief from stay for the purpose of litigating the subordination issue. This is proper because the

11   subordination issue goes to the question of the Debtor's equity in its property and the moving

12   creditor's status as a secured creditor."); *In re Mr. R's Prepared Foods, Inc.*, 251 B.R. 24, 28

13   (Bankr. D. Conn. 2000).

14       For example, in *Poughkeepsie Hotel, supra*, the major secured creditor moved for relief

15   from stay to enforce a foreclosure judgment. The trustee and an unsecured creditor opposed relief

16   arguing the mortgage lien should be equitably subordinated pursuant to Code § 510(c). The sole

17   issue before the court was "whether equitable subordination under Code § 510(c) may be asserted

18   as a defense to a motion for relief from the automatic stay under Code § 362(d)." Id. at 289. The

19   Court decided in the affirmative, reasoning as follows:

20       The rationale for allowing the affirmative defense of equitable subordination to a
         motion for relief from the automatic stay is easily illustrated. Where a foreclosure
21       action is pending, a debtor may file a bankruptcy petition or its creditors may
         commence an involuntary petition against the debtor to stay the foreclosure sale.
22       Upon commencement of the bankruptcy case, the debtor and its unsecured
         creditors have a "variety of protections under the Bankruptcy Code to capture any
23       equity in the property, subject to providing adequate protection to the secured
         creditor." These protections include Bankruptcy Code § 510(c) (equitable
24       subordination). Should, for example, the respondent to a motion for relief from
         the automatic stay prevail on an equitable subordination defense, the movant
25       would be deprived of secured status, thereby creating equity for the benefit of the
26       estate.
27
    *Poughkeepsie Hotel*, 132 B.R. at 293 (quotations and citations omitted).
28

MAINDOCS-#168902-v1-OnePelican_OppToRFS.DOC

1    The Court in *Poughkeepsie Hotel*, held that while it was inappropriate to formally

2  adjudicate the subordination of the lien in the context of a relief from stay hearing, the Court could

3  and should consider equitable subordination in determining that creditor's right to relief.

4  *Poughkeepsie Hotel*, at 293 ("While adjudication of the merits of potential counterclaims and

5  affirmative defenses could seriously infringe upon the creditor's right to an expedited hearing, it is

6  perfectly appropriate to acknowledge the presence of such claims in determining that creditor's

7  equitable right to relief.") (quotation omitted). After concluding that the defense could be raised,

8  the court continued for a final hearing to consider "the sufficiency of the defense". *Id.*

9    Similarly, in *Mr. R's Prepared Foods*, 251 B.R. 24 (Bankr.D.Conn. 2000), the moving

10  creditors sought relief from stay to enforce their security interest. Certain "objectors" opposed

11  relief from stay on the ground that the security interest should be equitably subordinated pursuant

12  to Bankruptcy Code. *See also In re Springs Hospitality*, 2006 WL 2458679, 9 (Bankr.D.Colo.

13  2006) ("Equitable subordination is a defense to a motion for relief from the automatic stay. In

14  appropriate circumstances, bankruptcy courts will deny a motion for relief from stay for the

15  purpose of litigating the subordination issue. This is proper because the subordination issue goes to

16  the question of the Debtor's equity in its property and the moving creditor's status as a secured

17  creditor.") (citation omitted). § 510(c). *Id.* at 28. The Court in *Prepared Foods* held that equitable

18  subordination may be properly considered as an affirmative defense to a motion for relief from

19  stay, and that the motion should be denied where a sufficient showing of the bona fides of the

20  subordination claim is presented:

21       While the objectors do not dispute the debtor's lack of equity or the validity of the
         movants' security interests, they assert, as an affirmative defense, that the security
22       interests at issue should be equitably subordinated. The affirmative defense of
         equitable subordination under Code § 510(c) may properly be asserted as a
23       defense to a motion for relief from stay. The issue is limited to whether the
         [objectors have] presented sufficient evidence of the bona fides of their claim for
24       the court to deny the motion for relief from stay.

25  *Mr. R's Prepared Foods*, 251 B.R. at 28 (Bankr.D.Conn. 2000) (internal quotes & citations

26  omitted).

27    For the same reasons, a secured creditor is not entitled to adequate protection pending a

28

MAINDOCS-#168902-v1-OnePelican_OppToRFS.DOC

1  determination of the validity of its lien. In *In re Waste Alternatives, Inc.*, 71 B.R. 14 7, 148

2  (Bankr.M.D.Fla. 1994), a secured creditor moved for relief from stay. The committee challenged

3  the validity of the creditor's lien. The Court held that while it may not determine the validity of the

4  lien in the context of a relief from stay motion, it may consider evidence of the invalidity of the

5  lien "in determining the appropriateness of requiring the parties to litigate the lien's validity at all

6  *or the need for adequate protection.*" *Id.* at 148 (emphasis added). The Bankruptcy Court lifted the

7  automatic stay "only to the extent that an action be filed in a court of competent jurisdiction to

8  determine the validity and extent of[ creditor's] lien." *Id.* The Court concluded that it would not lift

9  the stay to allow foreclosure, nor grant adequate protection, until after the determination of the

10  validity of the creditor's lien:

11  > The complexity of the issues raised in opposition to [creditor's] motion requires,
   > as stated in the Code, the filing of an adversary proceeding or a separate trial, ***
12  > [T]he resolution of[ creditor's] lien is necessary before the Court can decide the
   > merits of lifting the stay and allowing [creditor] to act upon the collateral. ...
13  > Id. at 148. Only after an adjudication of the validity and extent of the lien would
14  > the court determine "(1) further modification of the automatic stay; or, (2) the
   > need for adequate protection until a plan is confirmed."
15
   *Id.* at 149.
16
17      Granting OneWest relief from stay to foreclose prior to an adjudication of the validity and

18  priority of its lien, would deprive the Debtor and the creditors of the "significant right" to seek

19  equitable subordination. As observed by the court in *In re 9281 Shore Road Owners Corp.*, 187

20  B.R. 837 (E.D.N.Y. 1995):

21  > In this case, the Debtor has been summarily deprived of the right to try its equitable
   > subordination claim on the merits in the only available forum, the Bankruptcy Court.
22  > This resulted in the deprivation of a significant right on behalf of the Debtor. The
   > right to equitable subordination in a bankruptcy proceeding is so important that it has
23  > been adjudicated as a defense to a motion for relief from the automatic stay.

24  *9281 Shore Road Owners*, 187 B.R. at 854.

25      Here, the validity and priority of OneWest's liens and the estate's equity in the Project is

26  subject to a bona fide dispute. Due to La Jolla's and OneWest's pre-petition and post-petition

27  inequitable misconduct, the Debtors' estates are entitled to subordinate OneWest claim and to transfer

28  OneWest's liens to the Debtor's' estate.

MAINDOCS-#168902-v1-OnePelican_OppToRFS.DOC

**B.**     **The Debtor Has a Strong Equitable Subordination Claim**.

It is well-settled that "bankruptcy courts exercise broad equitable power to subordinate claims." *See In re Universal Farming Industries*, 873 F .2d 1334, 133 7 (9th Cir. 1989). Equitable subordination generally requires the three following findings: "( 1) that the claimant engaged in some type of inequitable conduct; (2) that the misconduct injured creditors or conferred unfair advantage on the claimant; and (3) that the subordination would not be inconsistent with the Bankruptcy Code." *In re First Alliance Mortg. Co.*, 471 F.3d 977, 1007 (9th Cir. 2006). The inequitable conduct justifying equitable subordination need not arise from the acquisition or assertion of the claim sought to be subordinated. *See, In re Pacific Exp.*, 69 B.R. 112, 116 (9th Cir. BAP 1986). In this case, all of the applicable elements are satisfied. The evidence adduced at trial will establish the following:

1.      La Jolla demanded an additional $1.2 million from the Debtor to fund the completion of the Project and further promised to re-advance these funds under false pretenses. In fact, La Jolla was insolvent at this point in time and it was seeking these funds to shore up its own insolvent capital base, and had no intention of re-advancing the same;

2.      When La Jolla was required to re-advance the $1.2 million, it failed and refused to do so due to its own insolvency;

3.      Instead of advising the Debtor in July and throughout the remainder of 2009 that it was insolvent and consequently could not perform its obligations under the Construction Loan, La Jolla hid the truth and proffered a series of baseless excuses. This course of conduct induced the Debtor and the sub-contractors onsite to continue working on the Project in anticipation of fund, when in fact none would be forthcoming; and

4.      Even as late as two days before its seizure, La Jolla's officers were still attempting to hide the banks complete insolvency; and

5.      As result of La Jolla's misrepresentations, and repudiation of its obligations under the terms of the Construction Loan, the Debtor suffered in excess of $7.0 million in damages in the form of unpaid vendor debts, accrued costs and in the value degradation that occurred prepetition.

MAINDOCS-#168902-v1-OnePelican_OppToRFS.DOC

1    On these facts, a clear case of subordination exists justifying the subordination of OneWest's

2    alleged claim and lien to the rights of all other creditors who were damaged by La Jolla's and

3    OneWest's wrongful conduct. The "equity" created by this subordination can be realized through

4    the reorganization plan being filed herewith, thereby eliminating a basis for relief under 11 U.S.C.

5    § 362(d).

6                                             **VII.**

7                                        **CONCLUSION**

8         For the foregoing reasons, the Debtor would respectively pray that the Court deny the

9    Motion.

10   DATED:  November 1, 2011              **WINTHROP COUCHOT**
                                           **PROFESSIONAL CORPORATION**
11

12                                         By:    /s/ *Marc J. Winthrop*
                                                  Marc J. Winthrop
13                                                Sean A. O'Keefe
                                           General Insolvency Counsel for Debtor and
14                                         Debtor-in-Possession

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MAINDOCS-#168902-v1-OnePelican_OppToRFS.DOC

## DECLARATION OF COREY GULBRANSON

I, Corey Gulbranson, hereby declare and state as follows:

1.    I am over the age of eighteen years, and I am authorized to make this declaration on behalf of One Pelican Hills Road North, L.P. (the "Debtor").

2.    I am the managing member of VDL One Pelican Hill, LLC, the general partner of the Debtor.

3.    The facts stated herein are within my personal knowledge. Any opinions stated herein are the opinions of the Debtor.

4.    In my capacity as the managing member of VDL I am the custodian of records of the books and records of the Debtor. Such books and records were and are retained in the ordinary course of business in a consistent and business-like manner. All of the document attached hereto are true and correct copies of documents obtained from the books and records of the Debtor.

5.    I am a general contractor and a real estate broker.

6.    I was directly involved with the construction of the improvements that are now located the Project and I am familiar with all material aspects of the Project.

### Summary Of Material Facts

7.    The Debtor is a California limited partnership that was formed to develop, build and sell a residential estate in "Newport Coast" that is commonly referred to as the "Villa Del Lago" and that is referred to herein as the "Project."

8.    The Debtor was originally formed by or at the direction of John McMonigle ("McMonigle") and McMonigle served as its general partner until shortly prior to the date the Debtor filed Chapter 11, June 6, 2011.

9.    The Project is comprised on a 12.5 acre parcel of land that has been improved by a 16,606 square foot Italianate villa, horse stables and riding arena, guard house (1,126 square feet), a pool pavilion (980 square feet), a man-made lake, tennis court, terraced gardens and expansive lawns.

10.    The formal address of the property is One Pelican Hill Road North, Newport Beach, California. The property is situated within the Newport Coast community, which is one of

the most prestigious and expensive residential communities in the world. The average price for a three bedroom home is approximately $3.0 million, and larger homes with views or with larger lots range in the $5.0 to $10.00 million range. The largest homes in the area, and those with favorable views, sell for prices in the $15.0 to $25.0 million range.

11.     Although the Newport Coast community has its share of extraordinary estates, the Villa Del Lago is unique in one critical respect. The estate has the largest land area of any home in the community, and this land area is improved with a 17,000 square feet villa, a lake, expansive gardens, tennis court, and stables and a riding arena for horses. In short it is a one-of-kind property.

12.     The ultimate buyer of the Project will be buying three attributes that no other home in Newport Coast can offer: Twelve acres of land; the privacy of walled estate; and the safety of an exclusive compound. These attributes will appeal to wealthy buyers, celebrities and dignitaries throughout the world.

13.     In addition to the Project, the Property has approximately $4.2 million in cash that OneWest is holding as additional security for the Construction Loan (defined below). Since the Debtor believes that the Property has a fair market value in the $30.0 million range, the Debtor's assets have a combined value, before secured claims (gross), of approximately $34.2 million.

14.     The Property is subject to the following allegedly secured claims:

A)     A claim in favor of the County of Orange for unpaid property taxes in the amount of $6,313.83;

B)     A construction loan (the "Construction Loan") in favor of OneWest that has a disputed balance of approximately $20 million; and

C)     A second priority deed of trust securing a promissory note with a balance of $2.5 million;

D)     Two deeds of trust that appear to have been recorded on the same day against the Property in a third priority position securing a $4.0 million and $1.0 million promissory note; and

MAINDOCS-#168902-v1-OnePelican_OppToRFS.DOC

1        E)     Various junior mechanics liens in fifth priority securing approximately

2    $500,000 in claims.

3        15.    In addition to the above secured claims the Debtor has approximately $1.5 million

4    in unsecured claims.

5                 **The Debtor's Construction Loan**.

6        16.    On April 17, 2007, the Debtor and La Jolla entered into that certain Construction

7    Loan Agreement (the "Construction Loan"), Promissory Note (the "Construction Note") in the

8    original principal amount of $21,600,000, and Construction Deed of Trust (the "Construction

9    DOT"). Copies of these documents are attached hereto as Exhibit "1", "2" and "3" respectively.

10       17.    Pursuant to the terms of the Construction Loan and Construction Note, La Jolla

11    agreed to fund the construction of the improvements to the Project up to the principal balance of

12    $21,600,000.

13          **La Jolla's Default Under The Terms of The Construction Loan**

14       18.    In the summer of 2009, La Jolla and the Debtor into that certain Change in Terms

15    Agreement dated July 1, 2009. A true and correct copy of this agreement is attached hereto as

16    Exhibit "4".

17       19.    In this modification to the Construction Loan the parties agreed that the interest

18    (payments) only "construction period" under the terms of the Construction Loan would be

19    extended for nine months from October 1, 2009, and the Debtor would deposit an additional $1.2

20    million to be used for construction. Although these funds were the Debtors, it was agreed that

21    disbursement would be monitored by "funds control" within La Jolla to insure that they were in

22    fact used for the Project. The agreed upon $1.2 million was in fact funded by the Debtor.

23       20.    Pursuant to the *Change In Terms Agreement*, the parties were agreeing that the

24    Construction Loan was in compliance and that both sides were obligated to continue to perform

25    thereunder.

26       21.    La Jolla failed to comply with its side of the bargain. Attached hereto as

27    Exhibit "5" are a series of emails from the chief financial offer of the McMonigle Residential

28    Group detailing La Jolla's failure to fund it obligations under the terms of the Construction Loan.

-22-

1   At the time these funding failures occurred, La Jolla was in a financial free-fall and it was

2   ultimately seized in February of 2010.

3       22.    Attached hereto as Exhibit "6" is an article confirming that La Jolla was seized by

4   the FDIC in February of 2010.

5       23.    Based upon the testimony of John McMonigle, which is set forth in a declaration

6   filed concurrently herewith, the Debtor believes that La Jolla's internal document will show that

7   La Jolla lacked the funds to meet its obligations under the Construction Loan and was not in a

8   position to allow the Debtor to draw down on its own funds, since this would further exacerbate

9   La Jolla's internal funding crisis. The Debtor further believes that La Jolla hid the truth from the

10  Debtor and in fact, as late as two days before its seizure, the La Jolla bankers who were

11  responsible for the credit were still hiding the proverbial ball regarding their own imminent

12  collapse.

13      24.    Had La Jolla funded it obligations under the Construction Loan as agreed,

14  substantially all of the unsecured claims now asserted against the Project would have been paid,

15  and the Project would have been completed. This would have made the Project immediately

16  saleable for a price in excess of $30 million. La Jolla's failure to fund has caused the Debtor to

17  incur $1.5 million in unpaid unsecured claims, to incur unpaid property taxes, to lose the

18  additional sale value inherent in the Project as a finished asset, and OneWest's refusal to cure La

19  Jolla's default forced the Debtor into Chapter 11. The total compensatory damages incurred by the

20  Debtor exceed seven million dollars.

21                          **The Debtor's Sale Effort**.

22      25.    In the Motion, OneWest contends that the Debtor's efforts to sell the property have

23  been unsuccessful and consequently relief from stay should be granted. This assertion is false.

24      26.    The Project is a unique and expensive asset, and the Debtor is attempting to sell it

25  during one of the worst economic periods in United States' history. Given these circumstances a

26  six to nine month sale period is reasonable. Unfortunately, *due to OneWest's interference*, the

27  Debtor only secured the services of HOM Realty Group in late August of 2011. Accordingly, the

28  Debtor's sale effort is only now getting off the ground, during the slowest part of the sales season.

1    27.    As the plan of reorganization and disclosure statement being filed concurrently

2   herewith establish, the Debtor is moving this case forward to a definitive conclusion that will yield

3   the best possible result for all creditors hold allowed claims. This process should be allowed to

4   proceed without interference by the creditors whose prepetition breach was the cause of the

5   Debtor's financial problems.

6                                    **The Value of the Project**.

7    28.    In the appraisal prepared by OneWest, the appraiser states: "The property is

8   unique as it is a very large property on a large land area for Newport Beach." Yet, instead of

9   seeking out similar or "comparable" properties in this valuation effort, the OneWest's appraiser

10  selects a series of properties that are anything but comparable.

11   29.    The summary table below illustrates vast gulf between the properties selected by

12  OneWest's appraiser as purported comparables and the Project:

| | 1 Pelican | Comp 1 | Comp 2 | Comp 3 | Comp 4 |
|---|---|---|---|---|---|
| Land (sq. ft.) | 522720 | 26888 | 22183 | 29541 | 22888 |
| % Comparison | 100% | 5% | 4% | 6% | 4% |

| | 1 Pelican | Comp 5 | Comp 6 | Comp 7 | Comp 8 | Comp 9 |
|---|---|---|---|---|---|---|
| Land (sq. ft.) | 522720 | 517928.4 | 28477 | 418176 | 40430 | 69696 |
| % Comparison | 100% | 99% | 5% | 80% | 8% | 13% |

30.    Seven of the so-called "comps" above have *90% less acreage* than the Project, and

between[10] 15% and 44% less interior living space, excluding Comp 8. The only two properties

whose land area is even remotely comparable to the Project's land are Comp 5 and Comp 7.

However, here again no reasoned comparison exists: *Comp 5 is a bank foreclosure and Comp 7 is*

*fifteen miles inland.*

31.    In sum, the properties selected by OneWest's appraiser are not even remotely

comparable and consequently the value indicator derived from his analysis should be rejected.[11]

---

[10] The Project includes a 1,100 square foot gatehouse and a separate wine cave that are not counted in the square foot analysis.

[11] OneWest's appraiser should have stayed with in his core assessment and looked for other "unique" properties for value comparatives. Moreover, as Mr. Donahue, the appraiser being employed by the Debtor correctly notes, in developing a value solution for an iconic property of this nature, the search for market comparatives should have covered a larger area, since a buyer of a property of this kind would

1    32.    If marketed for a commercially reasonable marketing period, the Debtor believes

2    that the Project will sell for a price in excess of $25 million. The delta in excess of this sum could

3    $5 million or it could be $10 million, due to the uniqueness of the Property and the current

4    problematic state of the economy.

5                                    **The Reorganization Concept**.

6    33.    As explained in the concurrently filed plan and disclosure statement, the objective

7    of the Chapter 11 is to market and sell the Property for the highest price obtainable through a

8    commercial auction. This auction will occur in the Spring after a commercial reasonable

9    marketing period. If this auction succeeds, the Debtor believes that the claims of all creditors

10   holding allowed claims will be paid in full.

11          I declare that the foregoing is true and correct under the penalty of perjury.

12          Executed in Orange County, California on first day of November, 2011.

13

14   _____
     Corey Gulbranson.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit** 1

## CONSTRUCTION LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $21,600,000.00 | 04-17-2007 | 10-01-2009 | 1041022857 | | | FM | |

References in the shaded areas are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** ONE PELICAN HILL ROAD NORTH, LP. (TIN:
35-2207230)
140 NEWPORT CENTER #100
NEWPORT BEACH, CA 92660

**Lender:** LA JOLLA BANK, FSB
398 WEST VALLEY PARKWAY
ESCONDIDO, CA 92025

THIS CONSTRUCTION LOAN AGREEMENT dated April 17, 2007, is made and executed between ONE PELICAN HILL ROAD NORTH, LP. ("Borrower") and LA JOLLA BANK, FSB ("Lender") on the following terms and conditions. Borrower has applied to Lender for one or more loans for purposes of constructing the improvements on the Real Property described below. Lender is willing to lend the loan amount to Borrower solely under the terms and conditions specified in this Agreement and in the Related Documents, to each of which Borrower agrees. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement, and (B) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of April 17, 2007, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until October 1, 2009.

**LOAN.** The Loan shall be in an amount not to exceed the principal sum of U.S. $21,600,000.00 and shall bear interest on so much of the principal sum as shall be advanced pursuant to the terms of this Agreement and the Related Documents. The Loan shall bear interest on each Advance from the date of the Advance in accordance with the terms of the Note. Borrower shall use the Loan Funds solely for the payment of: (A) the costs of constructing the Improvements and equipping the Project in accordance with the Construction Contract; (B) other costs and expenses incurred or to be incurred in connection with the construction of the Improvements as Lender in its sole discretion shall approve; and (C) if permitted by Lender, interest due under the Note, including all expenses and all loan and commitment fees described in this Agreement. The Loan amount shall be subject at all times to all maximum limits and conditions set forth in this Agreement or in any of the Related Documents, including without limitation, any limits relating to loan to value ratios and acquisition and Project costs.

**PROJECT DESCRIPTION.** The word "Project" as used in this Agreement means the construction and completion of all improvements contemplated by this Agreement, including without limitation the erection of the building or structure on the Real Property identified in this Agreement by Borrower and Lender, installation of equipment and fixtures, landscaping, and all other work necessary to make the Project usable and complete for the intended purposes. The Project includes the following work:

CONSTRUCTION OF A SINGLE FAMILY DWELLING PER PLANS, SPECIFICATIONS AND COST BREAKDOWN SUBMITTED TO LENDER.

The word "Property" as used in this Agreement means the Real Property together with all improvements, all equipment, fixtures, and other articles of personal property now or subsequently attached or affixed to the Real Property, together with all accessions, parts, and additions to, all replacements of, and all substitutions for any of such property, and all proceeds (including insurance proceeds and refunds of premiums) from any sale or other disposition of such property. The real estate described below constitutes the Real Property as used in this Agreement.

The real estate legally described as:
SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.
Its address or its commonly known as:
Real Property located at 1 PELICAN HILL ROAD NORTH, NEWPORT BEACH, CA 92657.

**FEES AND EXPENSES.** Whether or not the Project shall be consummated, Borrower shall assume and pay upon demand all out-of-pocket expenses incurred by Lender in connection with the preparation of loan documents and the making of the Loan, including without limitation the following: (A) all closing costs, loan fees, and disbursements; (B) all expenses of Lender's legal counsel; and (C) all title examination fees, title insurance premiums, appraisal fees, survey costs, recording fees, and filing and recording fees.

**NO CONSTRUCTION PRIOR TO RECORDING OF SECURITY DOCUMENT.** Borrower will not permit any work or materials to be furnished in connection with the Project until (A) Borrower has signed the Related Documents; (B) Lender's mortgage or deed of trust and other Security Interests in the Property have been duly recorded and perfected; (C) Lender has been provided evidence, satisfactory to Lender, that Borrower has obtained all insurance required under this Agreement or any Related Documents and that Lender's liens on the Property and Improvements are valid perfected first liens, subject only to such exceptions, if any, acceptable to Lender.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any indebtedness exists:

**Organization.** Borrower is a limited partnership which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign limited partnership in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 140 NEWPORT CENTER #100, NEWPORT BEACH, CA 92660. Unless Borrower has designated otherwise in writing, the principal office is the office in which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's principal office address or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (a) any provision of (a) Borrower's articles or agreements of partnership, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been: (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to

000027

*EXHIBIT "1"*



**Loan No: 1041022857**

## CONSTRUCTION LOAN AGREEMENT
### (Continued)

Page 2

any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**Title to Property.** Borrower has, or on the date of first disbursement of Loan proceeds will have, good and marketable title to the Collateral free and clear of all defects, liens, and encumbrances, excepting only liens for taxes, assessments, or governmental charges or levies not yet delinquent or payable without penalty or interest, and such liens and encumbrances as may be approved in writing by the Lender. The Collateral is contiguous to publicly dedicated streets, roads, or highways providing access to the Collateral.

**Project Costs.** The Project costs are true and accurate estimates of the costs necessary to complete the improvements in a good and workmanlike manner according to the Plans and Specifications presented by Borrower to Lender, and Borrower shall take all steps necessary to prevent the actual cost of the improvements from exceeding the Project costs.

**Utility Services.** All utility services appropriate to the use of the Project after completion of construction are available at the boundaries of the Collateral.

**Assessment of Property.** The Collateral is and will continue to be assessed and taxed as an independent parcel by all governmental authorities.

**Compliance with Governing Authorities.** Borrower has examined and is familiar with all the easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements affecting the Project. The Project will at all times and in all respects conform to and comply with the requirements of such easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements.

**Survival of Representations and Warranties.** Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Approval of Contractors, Subcontractors, and Materialmen.** Lender shall have approved a list of all contractors employed in connection with the construction of the Improvements, showing the name, address, and telephone number of each contractor, a general description of the nature of the work to be done, the labor and materials to be supplied, the names of materialmen, if known, and the approximate dollar value of the labor, work, or materials with respect to each contractor or materialman. Lender shall have the right to communicate with any person to verify the facts disclosed by the list or by any application for any Advance, or for any other purpose.

**Plans, Specifications, and Permits.** Lender shall have received and accepted a complete set of written Plans and Specifications setting forth all Improvements for the Project, and Borrower shall have furnished to Lender copies of all permits and requisite approvals of any governmental body necessary for the construction and use of the Project.

**Architect's and Construction Contracts.** Lender shall have furnished in form and substance satisfactory to Lender an executed copy of the Architect's Contract and an executed copy of the Construction Contract.

**Related and Support Documents.** Borrower shall provide to Lender in form satisfactory to Lender the following support documents for the Loan: Assignment of Construction Contract.

**Budget and Schedule of Estimated Advances.** Lender shall have approved detailed budget and cash flow projections of total Project costs and a schedule of the estimated amount and time of disbursements of each Advance.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the consummation of the Project and duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, in their sole discretion, may require.

**Bond.** If requested by Lender, Borrower shall have furnished a performance and/or payment bond in an amount equal to 100% of the amount of the Construction Contract, as well as a maintenance and mechanics' payment bond, with such riders and supplements as Lender may require, each in form and substance satisfactory to Lender, naming the General Contractor as principal and Lender as an additional obligee. Any required bonds and the contracts which they cover must be duly recorded or filed in accordance with California Civil Code Section 3235, if required by Lender.

**Appraisal.** If required by Lender, an appraisal shall be prepared for the Property, at Borrower's expense, which in form and substance shall be satisfactory to Lender, in Lender's sole discretion, including applicable regulatory requirements.

**Plans and Specifications.** If requested by Lender, Borrower shall have assigned to Lender's forms the Plans and Specifications for the Project.

**Environmental Report.** If requested by Lender, Borrower shall have furnished to Lender, at Borrower's expense, an environmental report and certificate on the Property in form and substance satisfactory to Lender, prepared by an engineer or other expert satisfactory to Lender stating that the Property complies with all applicable provisions and requirements of the "Hazardous Substances" paragraph set forth in this Agreement.

**Soil Report.** If requested by Lender, Borrower shall have furnished to Lender, at Borrower's expense, a soil report for the Property in form and substance satisfactory to Lender, prepared by a registered engineer satisfactory to Lender stating that the Property is free from soil or other geological conditions that would preclude its use or development as contemplated without extra expense for precautionary, corrective or remedial measures.

**Survey.** If requested by Lender, Borrower shall have furnished to Lender a survey of recent date, prepared and certified by a qualified surveyor and providing that the Improvements, if constructed in accordance with the Plans and Specifications, shall lie wholly within the boundaries of the Collateral without encroachment or violation of any zoning ordinances, building codes or regulations, or setback requirements, together with such other information as Lender in its sole discretion may require.

**Zoning.** Borrower shall have furnished evidence satisfactory to Lender that the Collateral is duly and validly zoned for the construction, maintenance, and operation of the Project.

**Title Insurance.** Borrower shall have provided to Lender an ALTA Lender's extended coverage policy of title insurance with such endorsements as Lender may require, issued by a title insurance company acceptable to Lender and in form, amount, and content satisfactory to Lender, insuring or agreeing to insure that Lender's security agreement or other security document on the Property is or will be upon recordation a valid first lien on the Property free and clear of all defects, liens, encumbrances, and exceptions except those as specifically accepted by Lender in writing. If requested by Lender, Borrower shall provide to Lender, at Borrower's expense, a foundation endorsement (CLTA 102.5 or its equivalent) to the title policy upon the completion of each foundation for the Improvements, showing no encroachments, and upon completion an endorsement which insures the lien-free completion of the Improvements (CLTA 101 series, as required by Lender).

000028

*EXHIBIT "1"*



CONSTRUCTION LOAN AGREEMENT
(continued)

Loan No: 1041022857                                                                                          Page 3

Insurance. Unless waived by Lender in writing, Borrower shall have delivered to Lender the following insurance policies or evidence thereof: (a) an all risks course of construction insurance policy (builder's risk), with extended coverage covering the improvements insured in an amount and by a company acceptable to Lender, containing a loss payable or other endorsement satisfactory to Lender insuring Lender as mortgagee, together with such other endorsements as may be required by Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. (b) owners and General Contractor general liability insurance, public liability and workmen's compensation insurance; (c) flood insurance if required by Lender or applicable law; and (d) all other insurance required by this Agreement or the Related Documents.

Workers' Compensation Coverage. Provide to Lender proof of the General Contractor's compliance with all applicable workers' compensation laws and regulations with regard to all work performed on the Project.

Payment of Fees and Expenses. Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

Satisfactory Construction. All work usually done at the stage of construction for which disbursement is requested shall have been done in a good and workmanlike manner and all materials and fixtures usually furnished and installed at that stage of construction shall have been furnished and installed, all in compliance with the Plans and Specifications. Borrower shall also have furnished to Lender such proofs as Lender may require to establish the progress of the work, compliance with applicable laws, freedom of the Property from liens, and the basis for the requested disbursement.

Certification. Borrower shall have furnished to Lender a certification by an engineer, architect, or other qualified inspector acceptable to Lender that the construction of the Improvements has complied and will continue to comply with all applicable statutes, ordinances, codes, regulations, and similar requirements.

Lien Waivers. Borrower shall have obtained and attached to each application for an Advance, including the Advance to cover final payment to the General Contractor, executed acknowledgments of payment of all sums due and lien releases of mechanics and materialmen's liens, satisfactory to Lender, from any party having lien rights, which acknowledgments of payment and releases of liens shall cover all work, labor, equipment, materials done, supplied, performed, or furnished prior to such application for an Advance.

No Event of Default. There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**DISBURSEMENT OF LOAN FUNDS.** The following provisions relate to the disbursement of funds from the Loan Fund.

Application for Advances. Each application shall be stated on a standard AIA payment request form or other form approved by Lender, executed by Borrower, and supported by such evidence as Lender reasonably requires. Borrower shall apply only for disbursement with respect to work actually done by the General Contractor and for materials and equipment actually incorporated into the Project. Each application for an Advance shall be deemed a certification of Borrower that as of the date of such application, all representations and warranties contained in the Agreement are true and correct, and that Borrower is in compliance with all of the provisions of this Agreement.

Payments. At the sole option of Lender, Advances may be paid in the joint names of Borrower and the General Contractor, subcontractor(s), or supplier(s) in payment of sums due under the Construction Contract. At its sole option, Lender may directly pay the General Contractor and any subcontractors or other parties the sums due under the Construction Contract. Borrower appoints Lender as its attorney-in-fact to make such payments. This power shall be deemed coupled with an interest, shall be irrevocable, and shall survive an Event of Default under this Agreement.

Projected Cost Overruns. If Lender at any time determines in its sole discretion that the amount in the Loan Fund is insufficient, or will be insufficient, to complete fully and to pay for the Project, then within ten (10) days after receipt of a written request from Lender, Borrower shall deposit in the Loan Fund an amount equal to the deficiency as determined by Lender. The judgment and determination of Lender under this section shall be final and conclusive. Any such amounts deposited by Borrower shall be disbursed prior to any Loan proceeds.

Final Payment to General Contractor. Upon completion of the Project and fulfillment of the Construction Contract to the satisfaction of Lender and provided sufficient Loan Funds are available, Lender shall make an Advance to cover the final payment due to the General Contractor upon delivery to Lender of endorsements to the ALTA title insurance policy following the posting of the completion notice, as provided under applicable law. Construction shall not be deemed complete for purposes of final disbursement unless and until Lender shall have received all of the following:

(1) Evidence satisfactory to Lender that all work under the Construction Contract requiring inspection by any governmental authority with jurisdiction has been duly inspected and approved by such authority, that a certificate of occupancy has been issued, and that all parties performing work have been paid, or will be paid, for such work;

(2) A certification by an engineer, architect, or other qualified inspector acceptable to Lender that the Improvements have been completed substantially in accordance with the Plans and Specifications and the Construction Contract, that direct connection has been made to all utilities set forth in the Plans and Specifications, and that the Project is ready for occupancy; and

(3) Acceptance of the completed Improvements by Lender and Borrower.

Construction Default. If Borrower fails in any respect to comply with the provisions of this Agreement or if construction ceases before completion, regardless of the reason, Lender, at its option, may refuse to make further Advances, may accelerate the indebtedness under the terms of the Note, and without thereby impairing any of its rights, powers, or privileges, may enter into possession of the construction and perform or cause to be performed any and all work and labor necessary to complete the Improvements, substantially in accordance with the Plans and Specifications.

Damage or Destruction. If any of the Collateral or Improvements is damaged or destroyed by casualty of any nature, within sixty (60) days thereafter Borrower shall restore the Collateral and Improvements to the condition in which they were before such damage or destruction with funds other than those in the Loan Fund. Lender shall not be obligated to make disbursements under the Agreement until such restoration has been accomplished.

Adequate Security. When any event occurs that Lender determines may endanger completion of the Project or the fulfillment of any condition or covenant in this Agreement, Lender may require Borrower to furnish, within ten (10) days after delivery of a written request, adequate security to eliminate, reduce, or indemnify Lender against such danger. In addition, upon such occurrence, Lender in its sole discretion may advance funds or agree to undertake to advance funds to any party to eliminate, reduce, or indemnify Lender against, such danger or to complete the Project. All sums paid by Lender pursuant to such agreements or undertakings shall be for Borrower's account and shall be without prejudice to Borrower's rights, if any, to receive such funds from the party to whom paid. All sums expended by Lender in the exercise of its option to complete the Project or protect Lender's interests shall be payable to Lender on demand together with interest from the date of the Advance at the rate applicable to the Loan. In addition, any Advance of funds under this Agreement, including without limitation direct disbursements to the General Contractor or other parties in payment of sums due under the Construction Contract, shall be deemed to have been expended by or on behalf of Borrower and to have been secured by Lender's Deed of Trust, if any, on the Collateral.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender.

**LIMITATION OF RESPONSIBILITY.** The making of any Advance by Lender shall not constitute or be interpreted as either (A) an approval or acceptance by Lender of the work done through the date of the Advance, or (B) a representation or indemnity by Lender to any party against any deficiency or defect in the work or against any breach of any contract. Inspections and approvals of the Plans and Specifications, the Improvements, the workmanship and materials used in the Improvements, and the exercise of any other right of inspection, approval, or inquiry granted to Lender in this Agreement are acknowledged to be solely for the protection of Lender's interests, and under no circumstances shall they be construed to impose any responsibility or liability of any nature whatsoever on Lender to any party. Neither Borrower nor any contractor, subcontractor, materialmen, laborer, or any other person shall rely, or have any right to rely, upon Lender's determination of the appropriateness of any Advance. No disbursement or approval by Lender shall constitute a representation by Lender as to the nature of the Project, its construction, or its intended use for Borrower or for any other person, nor shall it constitute an indemnity by Lender to Borrower or to any other person against any deficiency or defects in the Project or against any breach of any contract.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

Notices of Claims and Litigation. Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

000029

*EXHIBIT "1"*

CONSTRUCTION LOAN AGREEMENT
(Continued)

No: 1041022857      Page 4

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with such financial statements and other related information at such frequencies and in such detail as Lender may reasonably request.

**Additional Information.** Furnish such additional information and statements, lists of assets and liabilities, agings of receivables and payables, inventory schedules, budgets, forecasts, tax returns, and other reports with respect to Borrower's financial condition and business operations as Lender may request from time to time.

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Insurance.** Maintain fire and other risk insurance, real, federal crop insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantor named below, on Lender's forms, and in the amount and under the conditions set forth in those guaranties.

| Name of Guarantor | Amount |
| --- | --- |
| JOHN MCMONIGLE | Unlimited |

**Loan Fees, Charges and Expenses.** Whether or not the Project is completed, Borrower also shall pay upon demand all out-of-pocket expenses incurred by Lender in connection with the preparation of loan documents and the making of the Loan, including, without limitation, all closing costs, fees, and disbursements, all expenses of Lender's legal counsel, and all title examination fees, title insurance premiums, appraisal fees, survey costs, required fees, and filing and recording fees.

**Loan Proceeds.** Use the Loan Funds solely for payment of bills and expenses directly related to the Project.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender at least annually, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Construction of the Project.** Commence construction of the Project no later than April 17, 2007, and cause the Improvements to be constructed and equipped in a diligent and orderly manner and in strict accordance with the Plans and Specifications approved by Lender, the Construction Contract, and all applicable laws, ordinances, codes, regulations, and rights of adjoining or concurrent property owners. Borrower agrees to complete the Project for purposes of final payment to the General Contractor on or before September 30, 2008, regardless of the reason for any delay.

**Defects.** Upon demand of Lender, promptly correct any defect in the Improvements or any departure from the Plans and Specifications not approved by Lender in writing before further work shall be done upon the portion of the Improvements affected.

**Project Claims and Litigation.** Promptly inform Lender of (1) all material adverse changes in the financial condition of the General Contractor; (2) any litigation and claims, actual or threatened, affecting the Project or the General Contractor, which could materially affect the successful completion of the Project or the ability of the General Contractor to complete the Project as agreed; and (3) any condition or event which constitutes a breach or default under any of the Related Documents or any contract related to the Project.

**Payment of Claims and Removal of Liens.** (1) Cause all claims for labor done and materials and services furnished in connection with the Improvements to be fully paid and discharged in a timely manner, (2) diligently file or procure the filing of a valid notice of completion of the Improvements, in such comparable document as may be permitted under applicable lien laws, upon the happening of cessation of labor on the Improvements for a continuous period of thirty (30) days or more, and (4) take all reasonable steps necessary to remove all claims of liens against the Collateral, the Improvements, or any part of the Collateral or Improvements, or any rights or interests appurtenant to the Collateral or Improvements. Upon Lender's request, Borrower shall make such demands or claims upon or against laborers, materialmen, subcontractors, or other persons who have furnished or claim to have furnished labor, services, or materials in connection with the Improvements, which demands or claims shall under the laws of the State of California require diligent assertions of lien claims upon penalty of loss or waiver thereof. Borrower shall, within ten (10) days after the filing of any claim of lien that is disputed or contested by Borrower, record or cause the General Contractor for the construction of the Improvements to record in the appropriate governmental office, a surety bond pursuant to California law sufficient to release the claim of lien and, within five (5) days of Lender's demand, make suitable provision by deposit of funds with Lender in an amount satisfactory to Lender or by bond satisfactory to Lender for the possibility that the contest will be unsuccessful. If Borrower fails to remove any lien on the Collateral or Improvements or to provide a bond or deposit pursuant to this provision, Lender may pay such lien, or may contest the validity of the lien, and Borrower shall pay all costs and expense of such contest, including Lender's reasonable attorneys' fees.

**Taxes and Claims.** Pay and discharge when due all of Borrower's indebtedness, obligations, and claims that, if unpaid, might become a lien or charge upon the Collateral or Improvements; provided, however, that Borrower shall not be required to pay and discharge any such indebtedness, obligation, or claim so long as (1) its legality shall be contested in good faith by appropriate proceedings, (2) the indebtedness, obligation, claim does not become a lien or charge upon the Collateral or Improvements, and (3) Borrower shall have established on its books adequate reserves with respect to the amount contested in accordance with GAAP. If the indebtedness, obligation, or claim does become a lien or charge upon the Collateral or Improvements, Borrower shall remove the lien or charge as provided in the preceding paragraph.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests in the Collateral and Improvements.

**EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if ... of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due ... ... or pay under this Agreement or any Related Documents, Lender on Borrower's behalf ... ..., including but not limited to discharging or paying all taxes, liens, ...

000030

***EXHIBIT "1"***

 

CONSTRUCTION LOAN AGREEMENT
(continued)

Loan No: 1041022857

Page 5

interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

NEGATIVE COVENANTS. Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

Indebtedness and Liens. (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

Continuity of Operations. (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise.

Loans, Acquisitions and Guaranties. (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

Modification of Contract. Make or permit to be made any modification of the Construction Contract.

Liens. Create or allow to be created any lien or charge upon the Collateral or the Improvements.

Agreements. Borrower will not enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

GENERAL PROJECT PROVISIONS. The following provisions relate to the construction and completion of the Project:

Change Orders. All requests for changes in the Plans and Specifications, other than minor changes involving no extra cost, must be in writing, signed by Borrower and the architect, and delivered to Lender for its approval. Borrower will not permit the performance of any work pursuant to any change order or modification of the Construction Contract or any subcontract without the written approval of Lender. Borrower will obtain any required permits or authorizations from governmental authorities having jurisdiction before approving or requesting a new change order.

Purchase of Materials; Conditional Sales Contracts. No materials, equipment, fixtures, or articles of personal property placed in or incorporated into the Project shall be purchased or installed under any Security Agreement or other agreement whereby the seller reserves or purports to reserve title or the right of removal or repossession, or the right to consider such items as personal property after their incorporation into the Project, unless otherwise authorized by Lender in writing.

Lender's Right of Entry and Inspection. Lender and its agents shall have at all times the right of entry and free access to the Property and the right to inspect all work done, labor performed, and materials furnished with respect to the Project. Lender shall have unrestricted access to and the right to copy all records, accounting books, contracts, subcontracts, bills, statements, vouchers, and supporting documents for Borrower relating in any way to the Project.

Lender's Right to Stop Work. If Lender in good faith determines that any work or materials do not conform to the approved Plans and Specifications or sound building practices, or otherwise depart from any of the requirements of this Agreement, Lender may require the work to be stopped and withhold disbursements until the matter is corrected. In such event, Borrower will promptly correct the work to Lender's satisfaction. No such action by Lender will affect Borrower's obligation to complete the Improvements on or before the Completion Date. Lender is under no duty to supervise or inspect the construction or examine any books and record. Any inspection or examination by Lender is for the sole purpose of protecting Lender's security and preserving Lender's rights under this Agreement. No default of Borrower will be waived by any inspection by Lender. In no event will any inspection by Lender be a representation that there has been or will be compliance with the Plans and Specifications or that the construction is free from defective materials or workmanship.

Indemnity. Borrower shall indemnify and hold Lender harmless from any and all claims asserted against Lender or the Property by any person, entity, or governmental body, or arising out of or in connection with the Property, the Improvements, or Project. Lender shall be entitled to appear in any proceedings to defend itself against claims, and all costs and expenses attorneys' fees incurred by Lender in connection with such defense shall be paid by Borrower to Lender. Lender shall, in its sole discretion, be entitled to settle or compromise any asserted claims against it, and such settlement shall be binding upon Borrower for purposes of this indemnification. All amounts paid by Lender under this paragraph shall be secured by Lender's security agreement or Deed of Trust, if any, on the Property, shall be deemed an additional principal Advance under the Loan, payable upon demand, and shall bear interest at the rate applicable to the Loan.

Publicity. Lender may display a sign at the construction site informing the public that Lender is the construction lender for the Project. Lender may obtain other publicity in connection with the Project through press releases and participation in ground-breaking and opening ceremonies and similar events.

Actions. Lender shall have the right to commence, appear in, or defend any action or proceeding purporting to affect the rights, duties, or liabilities of the parties to this Agreement, or the disbursement of funds from the Loan Fund. In connection with this right, Lender may incur and pay reasonable costs, expenses and attorneys' fees. Borrower covenants to pay to Lender on demand all such expenses, together with interest from the date Lender incurs the expense at the rate specified in the Note, and Lender is authorized to disburse funds from the Loan Fund for such purposes.

DEFAULT. Each of the following shall constitute an Event of Default under this Agreement:

Payment Default. Borrower fails to make any payment when due under the Loan.

Other Defaults. Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

Environmental Default. Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any Loan.

False Statements. Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

Death or Insolvency. The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

Defective Collateralization. This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

Creditor or Forfeiture Proceedings. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Breach of Construction Contract. The Improvements are not constructed in accordance with the Plans and Specifications or in accordance with the terms of the Construction Contract.

Cessation of Construction. Prior to the completion of construction of the Improvements and equipping of the Project, the construction of the Improvements or the equipping of the Project is abandoned or work thereon ceases for a period of more than ten (10) days for any reason, or the Improvements are not completed for purposes of final payment to the General Contractor prior to September 30, 2009, regardless of the reason for the delay.

Transfer of Property. Sale, transfer, hypothecation, assignment, or conveyance of the Property or the Improvements or any portion thereof or interest therein by Borrower or any Borrower without Lender's prior written consent.

Condemnation. If any material portion of the Collateral is condemned, seized, or appropriated without compensation, and Borrower does not within thirty (30) days after such condemnation, seizure, or appropriation, initiate and diligently prosecute appropriate action to contest in good

000031

*EXHIBIT "1"*



**CONSTRUCTION LOAN AGREEMENT**
**(Continued)**

Loan No: 1041022857                                                          Page 6

faith the validity of such condemnation, seizure, or appropriation.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Events Affecting General Partner of Borrower.** Any of the preceding events occurs with respect to any General Partner of Borrower or any general partner dies or becomes incompetent.

**Change in Ownership.** The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cure the default within ten (10) days; or (2) if the cure requires more than ten (10) days, immediately initiate steps which Lender deems in its sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT; REMEDIES.** Upon the occurrence of any Event of Default and at any time thereafter, Lender may, at its option, but without any obligation to do so, and in addition to any other right Lender without reserve to Borrower have, do any one or more of the following without notice to Borrower: (a) Cancel this Agreement. (b) Institute appropriate proceedings to enforce the performance of this Agreement. (c) Withhold further disbursement of Loan Funds; (d) Expend funds necessary to remedy the default; (e) Take possession of the Property and continue construction of the Project; (f) Accelerate maturity of the Note and/or Indebtedness and demand payment of all sums due under the Note and/or Indebtedness; (g) Bring an action on the Note and/or Indebtedness; (h) Foreclose Lender's security agreement or Deed of Trust, if any, on the Property in any manner available under law; and (i) Exercise any other right or remedy which it has under the Note or Related Documents, or which is otherwise available at law or in equity or by statute.

**COMPLETION OF IMPROVEMENTS BY LENDER.** If Lender takes possession of the Collateral, it may take any and all actions necessary in its judgment to complete construction of the Improvements, including but not limited to making changes in the Plans and Specifications, work, or materials and entering into, modifying or terminating any contractual arrangements, subject to Lender's right at any time to discontinue any work without liability. If Lender elects to complete the Improvements, it will not assume any liability to Borrower or to any other person for completing the Improvements or for the manner or quality of construction of the Improvements, and Borrower expressly waives any such liability. If Lender employs attorneys or any such facility, Borrower irrevocably appoints Lender as its attorney-in-fact, with full power of substitution, to complete the Improvements, at Lender's option, either in Borrower's name or in its own name. In any event, all sums expended by Lender in completing the construction of the Improvements will be considered to have been disbursed to Borrower and will be secured by the Collateral for the Loan. Any such sums that cause the principal amount of the Loan to exceed the face amount of the Note will be considered to be an additional Loan to Borrower, bearing interest at the Note rate and being secured by the Collateral. For these purposes, Borrower assigns to Lender all of its right, title and interest in and to the Project Documents; however Lender will not have any obligation under the Project Documents unless Lender expressly hereafter agrees to assume such obligations in writing. Lender will have the right to exercise any rights of Borrower under the Project Documents upon the occurrence of an Event of Default. Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement or by any other writing, shall be cumulative and may be exercised singularly or concurrently.

**ADDITIONAL DOCUMENTS.** Borrower shall provide Lender with the following additional documents:

**Articles or Agreement of Partnership.** Borrower has provided or will provide Lender with a certified copy of Borrower's Articles or Agreement of Partnership, together with an appropriate partnership consent or agreement authorizing and designating one or more of the partners to execute this Agreement, the Note and any and all Security Agreements directly or indirectly securing repayment of the same, and to consummate the borrowings and other transactions as contemplated under this Agreement, and to consent to the remedies following any default by Borrower as provided in this Agreement and in any Security Agreements.

**Opinion of Counsel.** When required by Lender, Borrower has provided or will provide Lender with an opinion of Borrower's counsel certifying to and that: (1) Borrower's Note, any Security Agreements and this Agreement constitute valid and binding obligations on Borrower's part that are enforceable in accordance with their respective terms; (2) Borrower is validly existing and in good standing; (3) Borrower has authority to enter into this Agreement and to consummate the transactions contemplated under this Agreement; and (4) such other matters as may have been requested by Lender or by Lender's counsel.

**CONSTRUCTION FINANCING SIGNS.** THE BORROWER HEREBY GRANTS THE RIGHT TO THE LENDER TO PLACE "CONSTRUCTION FINANCING" SIGNS ON THE PROPERTY.

**CONTRACTOR PROFIT.** THE CONTRACTOR PROFIT SHALL NOT BE DISBURSED UNTIL THIRTY (30) DAYS AFTER THE NOTICE OF COMPLETION HAS BEEN FILED AND THE CERTIFICATION BY THE BANK'S INSPECTOR THAT THE IMPROVEMENTS HAVE BEEN COMPLETED IN CONFORMANCE WITH THE APPROVED PLANS AND SPECIFICATIONS.

**LOAN ORDER PLAN.** BORROWER(S) ACKNOWLEDGE AND UNDERSTAND THAT THE AUTHORIZED SIGNER(S) LISTED BELOW WILL HAVE FULL ACCESS TO CONTROL DISBURSEMENT OF LOAN FUNDS AND THAT BANK WILL RELY THEREON. LA JOLLA BANK STRONGLY RECOMMENDS THAT BORROWER(S) APPOINT THEMSELVES AS THE AUTHORIZED SIGNER(S), OR AT A MINIMUM AS ONE OF THE AUTHORIZED SIGNERS. IF BORROWER(S) CHOOSES TO AUTHORIZE PERSONS OTHER THAN THEMSELVES, LA JOLLA BANK, FSB SHALL BE HELD FREE AND HARMLESS FROM ALL LIABILITY IN CONNECTION THEREWITH.

INITIALS _____

THE AUTHORIZED OWNER(S) OR CONTRACTOR, OR BOTH, OR THE DULY AUTHORIZED AGENT OF EITHER, MAY PRESENT TO THE BANK A WRITTEN LOAN DISBURSEMENT ORDER, DRAWN UPON THE MONIES IN SAID ACCOUNT, PAYABLE TO CONTRACTOR, MATERIALMAN, OR LABORER FOR WORK DONE OR MATERIALS FURNISHED AND INCORPORATED IN SUCH CONSTRUCTION. THE PRESENTATION TO THE BANK OF SUCH ORDER SHALL CONSTITUTE A REPRESENTATION ON THE PART OF THE UNDERSIGNED THAT THE MONIES THEREIN REFERRED TO, AND THE BANK WILL BE ENTITLED TO RELY THEREON, AND SHALL BE HELD FREE AND HARMLESS FROM ALL LIABILITY IN CONNECTION THEREWITH. SUCH ORDERS MAY BE APPROVED AND PAID BY THE BANK UPON SUCH TERMS AND CONDITIONS AS IT MAY SEE FIT TO IMPOSE.

INITIALS _____

SUBJECT TO THE PROVISIONS OF THIS AGREEMENT, THE UNDERSIGNED BORROWER(S) HEREBY AUTHORIZE LA JOLLA BANK, FSB TO ISSUE VOUCHER BOOKS TO, AND DISBURSE FUNDS UPON RECEIPT OF WRITTEN AUTHORIZATION BY:

JOHN MCMONIGLE

INITIALS _____

**INTEREST RESERVE.** A PORTION OF THE LOAN PROCEEDS SHALL BE SET ASIDE IN AN INTEREST RESERVE TO BE USED TO MAKE MONTHLY INTEREST PAYMENTS. BORROWERS AUTHORIZE LENDER TO AUTOMATICALLY WITHDRAW FUNDS FROM THE INTEREST RESERVE TO MAKE PAYMENTS WHEN DUE.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Authority to File Notices.** Borrower appoints and designates Lender as its attorney-in-fact to file for the record any notice that Lender deems necessary to protect its interest under this Agreement. This power shall be deemed coupled with an interest and shall be irrevocable while any sum or performance remains due and owing under any of the Related Documents.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

000032

*EXHIBIT "1"*

 

**CONSTRUCTION LOAN AGREEMENT**
**(Continued)**

Loan No: 1041022857      Page 7

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of laws provisions. This Agreement has been accepted by Lender in the State of California.

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of SAN DIEGO County, State of California.

**Indemnification of Lender.** Borrower agrees to indemnify, to defend and to save and hold Lender harmless from any and all claims, suits, obligations, damages, losses, costs and expenses (including, without limitation, Lender's attorneys' fees, as well as Lender's architect's and engineering fees), demands, liabilities, penalties, fines and forfeitures of any nature whatsoever that may be asserted against or incurred by Lender, its officers, directors, employees, and agents arising out of, relating to, or in any manner occasioned by this Agreement and the exercise of the rights and remedies granted by Lender under this. The foregoing indemnity provisions shall survive the cancellation of this Agreement as to all matters arising or accruing prior to such cancellation and the foregoing indemnity shall survive in the event that Lender elects to exercise any of the remedies as provided under this Agreement following default hereunder.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Construction Loan Agreement, as this Construction Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Construction Loan Agreement from time to time.

**Architect's Contract.** The words "Architect's Contract" mean the architect's contract between Borrower and the architect for the Project.

**Borrower.** The word "Borrower" means ONE PELICAN HILL ROAD NORTH, L.P. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Completion Date.** The words "Completion Date" mean September 30, 2009.

**Construction Contract.** The words "Construction Contract" mean the contract dated March 23, 2007 between Borrower and ROBIN YOULD CONSTRUCTION, the general contractor for the Project, and any subcontracts with subcontractors, materialmen, laborers, or any other person or entity for performance of work on the Project or the delivery of materials to the Project.

**Contractor.** The word "Contractor" means ROBIN YOULD CONSTRUCTION, the general contractor for the Project.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan and any guarantor under a completion guaranty agreement.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future buildings, structures, facilities, fixtures, additions, and similar construction

000033

*EXHIBIT "1"*

 

**CONSTRUCTION LOAN AGREEMENT**
**(Continued)**

Loan No: 1041022857

Page 8

on the Collateral.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means LA JOLLA BANK, FSB, its successors and assigns.

**Loan.** The word "Loan" means the loan or loans made to Borrower under this Agreement and the Related Documents as described.

**Loan Fund.** The words "Loan Fund" mean the undisbursed proceeds of the Loan under this Agreement together with any equity funds or other deposits required from Borrower under this Agreement.

**Note.** The word "Note" means the promissory note dated April 17, 2007, in the original principal amount of $21,600,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Plans and Specifications.** The words "Plans and Specifications" mean the plans and specifications for the Project which have been submitted to and initialed by Lender, together with such changes and additions as may be approved by Lender in writing.

**Project.** The word "Project" means the construction project as described in the "Project Description" section of this Agreement.

**Project Documents.** The words "Project Documents" mean the Plans and Specifications, all studies, data and drawings relating to the Project, whether prepared by or for Borrower, the Construction Contract, the Architect's Contract, and all other contracts and agreements relating to the Project or the construction of the Improvements.

**Property.** The word "Property" means the property as described in the "Project Description" section of this Agreement.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in the "Project Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, assignment, pledge, crop pledge, chattel mortgages, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS CONSTRUCTION LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS CONSTRUCTION LOAN AGREEMENT IS DATED APRIL 17, 2007.**

**BORROWER:**

ONE PELICAN HILL ROAD NORTH, L.P.

By: _____
JOHN MCMONIGLE, General Partner of ONE
PELICAN HILL ROAD NORTH, LP.

**LENDER:**

LA JOLLA BANK, FSB

By: _____
Authorized Signer

000034

*EXHIBIT "1"*

EXHIBIT "A"

The land referred to herein is situated in the State of California, County of ORANGE, described as follows:

PARCEL 1:

LOTS 1 AND A OF TRACT NO. 15376, IN THE CITY OF NEWPORT BEACH, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 749, PAGES 40 AND 41 OF MISCELLANEOUS MAPS, RECORDS OF ORANGE COUNTY, CALIFORNIA.

EXCEPTING THEREFROM; ALL OIL, OIL RIGHTS, NATURAL GAS RIGHTS, MINERAL RIGHTS, AND OTHER HYDROCARBON SUBSTANCES BY WHATEVER NAME KNOWN, TOGETHER WITH APPURTENANT RIGHTS THERETO, WITHOUT, HOWEVER, ANY RIGHT TO ENTER UPON THE SURFACE OF SAID LAND NOR ANY PORTION OF THE SUBSURFACE LYING ABOVE A DEPTH OF 500 FEET, AS EXCEPTED OR RESERVED IN INSTRUMENTS OF RECORD.

EXCEPT ALL WATER, CLAIMS OR RIGHTS TO WATER, IN OR UNDER SAID LAND.

PARCEL 2:

EASEMENTS AS SET FORTH IN THE SUBSECTION ENTITLED "PEDESTRIAN TRAIL" OF THE SECTION ENTITLED "RESERVATIONS TO DECLARANT AND PARTICIPATING BUILDER" AND IN THE SECTIONS ENTITLED "EASEMENTS FOR OWNERS", "SUPPORT, SETTLEMENT AND ENCROACHMENT" AND "UTILITIES AND CABLE TELEVISION" OF THE ARTICLE ENTITLED "EASEMENTS AND RIGHTS" OF THE DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS FOR NEWPORT COAST COMMUNITY ASSOCIATION RECORDED MAY 24, 1991 AS INSTRUMENT NO. 91-257521, AS AMENDED BY AMENDMENT NO. 1 TO DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS FOR NEWPORT COAST COMMUNITY ASSOCIATION RECORDED DECEMBER 6, 1991 AS INSTRUMENT NO. 91-672706, BOTH OF OFFICIAL RECORDS OF ORANGE COUNTY, CALIFORNIA (COLLECTIVELY, THE "MASTER DECLARATION") AND IN THE SUPPLEMENTARY DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS FOR NEWPORT COAST COMMUNITY ASSOCIATION AND TRACT NO. 15376 RECORDED MAY 12, 1997 AS INSTRUMENT NO. 97-220590 OF SAID OFFICIAL RECORDS.

End of Legal Description

000035

*EXHIBIT "1"*

**Exhibit 2**

000036




## PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $21,600,000.00 | 04-17-2007 | 10-01-2009 | 1041022857 | | | PRM | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

Borrower:  ONE PELICAN HILL ROAD NORTH, L.P. (TIN:  
35-2207230)  
140 NEWPORT CENTER #100  
NEWPORT BEACH, CA 92660  

Lender:  LA JOLLA BANK, FSB  
390 WEST VALLEY PARKWAY  
ESCONDIDO, CA 92025  

**Principal Amount:  $21,600,000.00**                    Date of Note:  April 17, 2007

**PROMISE TO PAY.**  ONE PELICAN HILL ROAD NORTH, L.P. ("Borrower") promises to pay to LA JOLLA BANK, FSB ("Lender"), or order, in lawful money of the United States of America, the principal amount of Twenty-one Million Six Hundred Thousand & 00/100 Dollars ($21,600,000.00), together with interest on the unpaid principal balance from April 17, 2007, until paid in full. The interest rate will not increase above 11.500%.

**PAYMENT.** Subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in accordance with the following payment schedule: 18 monthly consecutive interest payments, beginning May 1, 2007, with interest calculated on the unpaid principal balances at an interest rate of 8.250% per annum; 11 monthly consecutive interest payments, beginning November 1, 2008, with interest calculated on the unpaid principal balances at an interest rate based on the the LOWEST NEW YORK PRIME RATE IN EFFECT ON THE FIRST BUSINESS DAY OF THE MONTH (CYCLE) AS PUBLISHED IN THE MONEY RATE SECTION OF THE WEST COAST EDITION OF THE WALL STREET JOURNAL, (currently 8.250%), plus a margin of 1.000 percentage points, plus a margin of 1.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an 8.250%; and one principal and interest payment of $21,784,218 on October 1, 2009, with interest calculated on the unpaid principal balances at an interest rate based on the THE LOWEST NEW YORK PRIME RATE IN EFFECT ON THE FIRST BUSINESS DAY OF THE MONTH (CYCLE) AS PUBLISHED IN THE MONEY RATE SECTION OF THE WEST COAST EDITION OF THE WALL STREET JOURNAL, (currently 8.250%), plus a margin of 1.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 8.250%. This estimated final payment is based on the assumption that all payments will be made exactly as scheduled and that the Index does not change; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts under this Note. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to any unpaid collection costs; and then to any late charges. Interest on this Note is computed on a 365/366 simple interest basis; that is, by applying the ratio of the annual interest rate over the number of days in a year, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the THE LOWEST NEW YORK PRIME RATE IN EFFECT ON THE FIRST BUSINESS DAY OF THE MONTH (CYCLE) AS PUBLISHED IN THE MONEY RATE SECTION OF THE WEST COAST EDITION OF THE WALL STREET JOURNAL (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notice to Borrower. Lender will tell Borrower the current index rate upon Borrower's request. The interest rate change will not occur more often than each MONTH. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 8.250% per annum. The interest rate or rates to be applied to the unpaid principal balance of this Note will be the rate or rates set forth herein in the "Payment" section. Notwithstanding any other provision of this Note, after the first payment stream, the interest rate for each subsequent payment stream will be effective as of the last payment date of the just-ending payment stream. Notwithstanding the foregoing, the variable interest rate or rates provided for in this Note will not be subject to the following minimum and maximum rates. NOTICE: Under no circumstances will the interest rate on this Note be less than 8.500% per annum or more than (except for any higher default rate shown below) the lesser of 11.500% per annum or the maximum rate allowed by applicable law. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (A) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date, (B) increase Borrower's payments to cover accruing interest, (C) increase the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and increase Borrower's final payment.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: LA JOLLA BANK, FSB, 390 WEST VALLEY PARKWAY, ESCONDIDO, CA 92025.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment or $5.00, whichever is greater.

**INTEREST AFTER DEFAULT.** Upon default, the variable interest rate on this Note shall immediately increase by 3.000 percentage points, if permitted under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

Payment Default. Borrower fails to make any payment when due under this Note.

Other Defaults. Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

Environmental Default. Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any loan.

False Statements. Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

Death or Insolvency. The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

Creditor or Forfeiture Proceedings. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Events Affecting Guarantor. Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

Events Affecting General Partner of Borrower. Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

Change in Ownership. The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

Adverse Change. A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

Cure Provisions. If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within ten (10) days; or (2) if the cure requires more than ten (10) days, immediately initiates steps

000037

*EXHIBIT "2"*

   

Loan No: 1041022857    **MISSORY NOTE**    Page 2
(Continued)

which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance on this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of SAN DIEGO County, State of California.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $10.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein:

(A)  a Construction Deed of Trust dated April 17, 2007, to a trustee in favor of Lender on real property located in ORANGE County, State of California.  That agreement contains the following due on sale provision:  Lender may, at Lender's option, declare immediately due and payable all sums secured by the Construction Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property.  A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property.  If any Borrower is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Borrower.  However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

(B)  collateral described in a Commercial Security Agreement dated April 17, 2007.

(C)  certificates of deposit described in an Assignment of Deposit Account dated April 17, 2007.

**BALLOON PAYMENT NOTICE. THIS LOAN CONTAINS PROVISIONS THAT ALLOW FOR A BALLOON PAYMENT AT MATURITY.**

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency.  Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: LA JOLLA BANK, FSB, 360 WEST VALLEY PARKWAY, ESCONDIDO, CA  92025.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note.  Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them.  Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor.  Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability.  All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party, partner, or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone.  All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.  The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.**

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

ONE PELICAN HILL ROAD NORTH, L.P.

By: _____
    JOHN MCMONIGLE, General Partner of ONE
    PELICAN HILL ROAD NORTH, L.P.

CERTIFIED TO BE A TRUE AND
CORRECT COPY OF THE ORIGINAL
_____
MARINERS ESCROW

000038

*EXHIBIT "2"*

**Exhibit 3**

000039

*~~~~~~~*
*TITLE=IRVINE*
*60225531*

RECORDATION REQUESTED BY:
LA JOLLA BANK, FSB
390 WEST VALLEY PARKWAY
ESCONDIDO, CA 92025

This Document was electronically recorded by
Lawart Title

Recorded In Official Records, Orange County
Tom Daly, Clerk-Recorder

|||||||||||||||||||||| 42.00
2007000290041 04:19pm 05/03/07
200 28 D11 13
0.00 0.00 0.00 0.00 36.00 0.00 0.00 0.00

FOR RECORDER'S USE ONLY

## CONSTRUCTION DEED OF TRUST

THIS DEED OF TRUST is dated April 17, 2007, among ONE PELICAN HILL ROAD NORTH, L.P., A CALIFORNIA LIMITED PARTNERSHIP, whose address is 140 NEWPORT CENTER , NEWPORT BEACH, CA 92660 ("Trustor"); LA JOLLA BANK, FSB, whose address is 390 WEST VALLEY PARKWAY, ESCONDIDO, CA 92025 (referred to below sometimes as "Lender" and sometimes as "Beneficiary"); and OLD REPUBLIC TITLE COMPANY, whose address is 1660 HOTEL CIRCLE NORTH, SUITE 500, SAN DIEGO, CA 92108 (referred to below as "Trustee").

CONVEYANCE AND GRANT. For valuable consideration, Trustor irrevocably grants, transfers and assigns to Trustee in trust, with power of sale, for the benefit of Lender as Beneficiary, all of Trustor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in ORANGE County, State of California:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

The Real Property or its address is commonly known as  1 PELICAN HILL ROAD NORTH, NEWPORT BEACH, CA  92657.

Trustor presently assigns to Lender (also known as Beneficiary in this Deed of Trust) all of Trustor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. This is an absolute assignment of Rents made in connection with an obligation secured by real property pursuant to California Civil Code Section 2938. In addition, Trustor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE  (A)  PAYMENT OF THE INDEBTEDNESS AND (B)  PERFORMANCE OF ANY AND ALL OBLIGATIONS OF THE TRUSTOR UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS DEED OF TRUST.    THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS ALSO GIVEN TO SECURE ANY AND ALL OF TRUSTOR'S OBLIGATIONS UNDER THAT CERTAIN CONSTRUCTION LOAN AGREEMENT BETWEEN TRUSTOR AND LENDER OF EVEN DATE HEREWITH.  ANY EVENT OF DEFAULT UNDER THE CONSTRUCTION LOAN AGREEMENT, OR ANY OF THE RELATED DOCUMENTS REFERRED TO THEREIN, SHALL ALSO BE AN EVENT OF DEFAULT UNDER THIS DEED OF TRUST.  THIS DEED OF TRUST IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

PAYMENT AND PERFORMANCE.  Except as otherwise provided in this Deed of Trust, Trustor shall pay to Lender all amounts secured by this Deed of Trust as they become due, and shall strictly and in a timely manner perform all of Trustor's obligations under the Note, this Deed of Trust, and the Related Documents.

CONSTRUCTION MORTGAGE.  This Deed of Trust is a "construction mortgage" for the purposes of Sections 9-334 and 2A-309 of the Uniform Commercial Code, as those sections have been adopted by the State of California.

POSSESSION AND MAINTENANCE OF THE PROPERTY.  Trustor agrees that Trustor's possession and use of the Property shall be governed by the following provisions:

Possession and Use.  Until the occurrence of an Event of Default, Trustor may  (1)  remain in possession and control of the Property;  (2)  use, operate or manage the Property; and  (3)  collect the Rents from the Property.

Duty to Maintain.  Trustor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

Compliance With Environmental Laws.  Trustor represents and warrants to Lender that:  (1)  During the period of Trustor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property;  (2)  Trustor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing,  (a)  any breach or violation of any Environmental Laws, (b)  any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or  (c)  any actual or threatened litigation or claims of any kind by any person relating to such matters; and  (3)

000040

*EXHIBIT "3"*

  

Loan No: 1041022357

**DEED OF TRUST**
**(Continued)**

Page 2

Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Trustor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Trustor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Trustor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Deed of Trust. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Trustor or to any other person. The representations and warranties contained herein are based on Trustor's due diligence in investigating the Property for Hazardous Substances. Trustor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Trustor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Deed of Trust or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Trustor's ownership or interest in the Property, whether or not the same was or should have been known to Trustor. The provisions of this section of the Deed of Trust, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Deed of Trust and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Trustor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Trustor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Trustor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Trustor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Trustor's compliance with the terms and conditions of this Deed of Trust.

**Compliance with Governmental Requirements.** Trustor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Trustor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Trustor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Trustor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Trustor agrees neither to abandon or leave unattended the Property. Trustor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**Construction Loan.** If some or all of the proceeds of the loan creating the Indebtedness are to be used to construct or complete construction of any Improvements on the Property, the Improvements shall be completed no later than the maturity date of the Note (or such earlier date as Lender may reasonably establish) and Trustor shall pay in full all costs and expenses in connection with the work. Lender will disburse loan proceeds under such terms and conditions as Lender may deem reasonably necessary to insure that the interest created by this Deed of Trust shall have priority over all possible liens, including those of material suppliers and workmen. Lender may require, among other things, that disbursement requests be supported by receipted bills, expense affidavits, waivers of liens, construction progress reports, and such other documentation as Lender may reasonably request.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Trustor is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Trustor. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Deed of Trust:

**Payment.** Trustor shall pay when due (and in all events at least ten (10) days prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material

000041

**EXHIBIT "3"**

Loan No: 1041022857

  

**ED OF TRUST**
**(Continued)**

Page 3

furnished to the Property. Trustor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Deed of Trust, except for the lien of taxes and assessments not due and except as otherwise provided in this Deed of Trust.

**Right to Contest.** Trustor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Trustor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Trustor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Trustor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Trustor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Trustor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Trustor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Trustor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Trustor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Deed of Trust.

**Maintenance of Insurance.** Trustor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on an actual cash value basis for the full insurable value covering all improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Trustor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Trustee and Lender being named as additional insureds in such liability insurance policies. Additionally, Trustor shall maintain such other insurance, including but not limited to hazard, business interruption, and boiler insurance, as Lender may reasonably require. Notwithstanding the foregoing, in no event shall Trustor be required to provide hazard insurance in excess of the replacement value of the improvements on the Real Property. Policies shall be written in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Trustor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Trustor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Trustor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Trustor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Trustor fails to do so within fifteen (15) days of the casualty. If in Lender's sole judgment Lender's security interest in the Property has been impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If the proceeds are to be applied to restoration and repair, Trustor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Trustor from the proceeds for the reasonable cost of repair or restoration if Trustor is not in default under this Deed of Trust. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to the Lender under this Deed of Trust, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Trustor as Trustor's interests may appear.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Deed of Trust, to the extent compliance with the terms of this Deed of Trust would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Deed of Trust for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**Trustor's Report on Insurance.** Upon request of Lender, however not more than once a year, Trustor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Trustor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value

000042

*EXHIBIT "3"*



Loan No: 1041022857

**DEED OF TRUST**
(Continued)

Page 4

replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Trustor fails to comply with any provision of this Deed of Trust or any Related Documents, including but not limited to Trustor's failure to comply with any obligation to maintain Existing Indebtedness in good standing as required below, or to discharge or pay when due any amounts Trustor is required to discharge or pay under this Deed of Trust or any Related Documents, Lender on Trustor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Trustor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Deed of Trust also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Deed of Trust:

  **Title.** Trustor warrants that: (a) Trustor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in the Existing Indebtedness section below or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Deed of Trust, and (b) Trustor has the full right, power, and authority to execute and deliver this Deed of Trust to Lender.

  **Defense of Title.** Subject to the exception in the paragraph above, Trustor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Trustor's title or the interest of Trustee or Lender under this Deed of Trust, Trustor shall defend the action at Trustor's expense. Trustor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Trustor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

  **Compliance With Laws.** Trustor warrants that the Property and Trustor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

  **Survival of Representations and Warranties.** All representations, warranties, and agreements made by Trustor in this Deed of Trust shall survive the execution and delivery of this Deed of Trust, shall be continuing in nature, and shall remain in full force and effect until such time as Trustor's Indebtedness shall be paid in full.

**EXISTING INDEBTEDNESS.** The following provisions concerning Existing Indebtedness are a part of this Deed of Trust:

  **Existing Lien.** The lien of this Deed of Trust securing the Indebtedness may be secondary and inferior to an existing lien. Trustor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

  **No Modification.** Trustor shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Deed of Trust by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Trustor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**CONDEMNATION.** The following provisions relating to eminent domain and inverse condemnation proceedings are a part of this Deed of Trust:

  **Proceedings.** If any eminent domain or inverse condemnation proceeding is commenced affecting the Property, Trustor shall promptly notify Lender in writing, and Trustor shall promptly take such steps as may be necessary to pursue or defend the action and obtain the award. Trustor may be the nominal party in any such proceeding, but Lender shall be entitled, at its election, to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Trustor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

  **Application of Net Proceeds.** If any award is made or settlement entered into in any condemnation proceedings affecting all or any part of the Property or by any proceeding or purchase in lieu of condemnation, Lender may at its election, and to the extent permitted by law, require that all or any portion of the award or settlement be applied to the Indebtedness and to the repayment of all reasonable costs, expenses, and attorneys' fees incurred by Trustee or Lender in connection with the condemnation proceedings.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Deed of Trust:

  **Current Taxes, Fees and Charges.** Upon request by Lender, Trustor shall execute such documents in addition to this Deed of Trust and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Trustor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Deed of Trust, including without limitation

000043

*EXHIBIT "3"*

 

Loan No: 1041022857

**ED OF TRUST**
**(Continued)**

Page 5

all taxes, fees, documentary stamps, and other charges for recording or registering this Deed of Trust.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Deed of Trust or upon all or any part of the Indebtedness secured by this Deed of Trust; (2) a specific tax on Trustor which Trustor is authorized or required to deduct from payments on the Indebtedness secured by this type of Deed of Trust; (3) a tax on this type of Deed of Trust chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Trustor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Deed of Trust, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Trustor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Deed of Trust as a security agreement are a part of this Deed of Trust:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Trustor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. Trustor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Trustor shall not remove, sever or detach the Personal Property from the Property. Upon default, Trustor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Trustor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Trustor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Deed of Trust may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Deed of Trust.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Deed of Trust:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Trustor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Trustor's obligations under the Note, this Deed of Trust, and the Related Documents, and (2) the liens and security interests created by this Deed of Trust as first and prior liens on the Property, whether now owned or hereafter acquired by Trustor. Unless prohibited by law or Lender agrees to the contrary in writing, Trustor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Trustor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Trustor and at Trustor's expense. For such purposes, Trustor hereby irrevocably appoints Lender as Trustor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Trustor pays all the Indebtedness when due, and otherwise performs all the obligations imposed upon Trustor under this Deed of Trust, Lender shall execute and deliver to Trustor a request for full reconveyance and shall execute and deliver to Trustor suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Lender may charge Trustor a reasonable reconveyance fee at the time of reconveyance.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Deed of Trust:

**Payment Default.** Trustor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Trustor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Deed of Trust or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Trustor.

**Compliance Default.** Failure to comply with any other term, obligation, covenant or condition contained in this Deed of Trust, the Note or in any of the Related Documents.

**Default on Other Payments.** Failure of Trustor within the time required by this Deed of Trust to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with the Property.

*EXHIBIT "3"*

 

Loan No: 1041022857

**DEED OF TRUST**
**(Continued)**

Page 6

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Trustor or on Trustor's behalf under this Deed of Trust or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Deed of Trust or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution or termination of Trustor's existence as a going business or the death of any partner, the insolvency of Trustor, the appointment of a receiver for any part of Trustor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Trustor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Trustor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Trustor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Trustor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Trustor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Trustor under the terms of any other agreement between Trustor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Trustor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Adverse Change.** A material adverse change occurs in Trustor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Existing Indebtedness.** The payment of any installment of principal or any interest on the Existing Indebtedness is not made within the time required by the promissory note evidencing such indebtedness, or a default occurs under the instrument securing such indebtedness and is not cured during any applicable grace period in such instrument, or any suit or other action is commenced to foreclose any existing lien on the Property.

**Right to Cure.** If any default, other than a default in payment is curable and if Trustor has not been given a notice of a breach of the same provision of this Deed of Trust within the preceding twelve (12) months, it may be cured if Trustor, after receiving written notice from Lender demanding cure of such default: (1) cures the default within ten (10) days; or (2) if the cure requires more than ten (10) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Deed of Trust, at any time thereafter, Trustee or Lender may exercise any one or more of the following rights and remedies:

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Trustor under this Deed of Trust, after Trustor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Foreclosure by Sale.** Upon an Event of Default under this Deed of Trust, Beneficiary may declare the entire Indebtedness secured by this Deed of Trust immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written notice of default and of election to cause to be sold the Property, which notice Trustee shall cause to be filed for record. Beneficiary also shall deposit with Trustee this Deed of Trust, the Note, other documents requested by Trustee, and all documents evidencing expenditures secured hereby. After the lapse of such time as may then be required by law following the recordation of the notice of default, and notice of sale having been given as then required by law, Trustee, without demand on Trustor, shall sell the Property at the time and place fixed by it in the notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of the Property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement. In accordance with applicable law, Trustee shall deliver to such purchaser its deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee or Beneficiary may purchase at such sale. After deducting all costs, fees and expenses of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of: all sums expended under the terms hereof, not then repaid, with accrued interest at the amount allowed by law in effect at the date hereof; all other sums then secured hereby; and the remainder, if any, to the person or persons

000045

*EXHIBIT "3"*

 

Loan No: 1041022857

**DEED OF TRUST
(Continued)**

Page 7

legally entitled thereto.

**Judicial Foreclosure.** With respect to all or any part of the Real Property, Lender shall have the right in lieu of foreclosure by power of sale to foreclose by judicial foreclosure in accordance with and to the full extent provided by California law.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code, including without limitation the right to recover any deficiency in the manner and to the full extent provided by California law.

**Collect Rents.** Lender shall have the right, without notice to Trustor to take possession of and manage the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Trustor irrevocably designates Lender as Trustor's attorney-in-fact to endorse instruments received in payment thereof in the name of Trustor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Tenancy at Sufferance.** If Trustor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Trustor, Trustor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Trustee or Lender shall have any other right or remedy provided in this Deed of Trust or the Note or by law.

**Notice of Sale.** Lender shall give Trustor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Sale of the Property.** To the extent permitted by applicable law, Trustor hereby waives any and all rights to have the Property marshalled. In exercising its rights and remedies, the Trustee or Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Deed of Trust, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Trustor also will pay any court costs, in addition to all other sums provided by law.

**Rights of Trustee.** Trustee shall have all of the rights and duties of Lender as set forth in this section.

**POWERS AND OBLIGATIONS OF TRUSTEE.** The following provisions relating to the powers and obligations of Trustee are part of this Deed of Trust:

**Powers of Trustee.** In addition to all powers of Trustee arising as a matter of law, Trustee shall have the power to take the following actions with respect to the Property upon the written request of Lender and Trustor: (a) join in preparing and filing a map or plat of the Real Property, including the dedication of streets or other rights to the public; (b) join in granting any easement or creating any restriction on the Real Property; and (c) join in any subordination or other agreement affecting this Deed of Trust or the interest of Lender under this Deed of Trust.

**Obligations to Notify.** Trustee shall not be obligated to notify any other party of a pending sale under any other trust deed or lien, or of any action or proceeding in which Trustor, Lender, or Trustee shall be a party, unless the action or proceeding is brought by Trustee.

**Trustee.** Trustee shall meet all qualifications required for Trustee under applicable law. In addition to the rights

000046

**EXHIBIT "3"**

  

**DEED OF TRUST**
(Continued)

Loan No: 1041022857

Page 8

and remedies set forth above, with respect to all or any part of the Property, the Trustee shall have the right to foreclose by notice and sale, and Lender shall have the right to foreclose by judicial foreclosure, in either case in accordance with and to the full extent provided by applicable law.

**Successor Trustee.** Lender, at Lender's option, may from time to time appoint a successor Trustee to any Trustee appointed under this Deed of Trust by an instrument executed and acknowledged by Lender and recorded in the office of the recorder of ORANGE County, State of California. The instrument shall contain, in addition to all other matters required by state law, the names of the original Lender, Trustee, and Trustor, the book and page where this Deed of Trust is recorded, and the name and address of the successor trustee, and the instrument shall be executed and acknowledged by Lender or its successors in interest. The successor trustee, without conveyance of the Property, shall succeed to all the title, power, and duties conferred upon the Trustee in this Deed of Trust and by applicable law. This procedure for substitution of Trustee shall govern to the exclusion of all other provisions for substitution.

**Acceptance by Trustee.** Trustee accepts this Trust when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law.

**NOTICES.** Any notice required to be given under this Deed of Trust shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Deed of Trust. Trustor requests that copies of any notices of default and sale be directed to Trustor's address shown near the beginning of this Deed of Trust. All copies of notices of foreclosure from the holder of any lien which has priority over this Deed of Trust shall be sent to Lender's address, as shown near the beginning of this Deed of Trust. Any party may change its address for notices under this Deed of Trust by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Trustor agrees to keep Lender informed at all times of Trustor's current address. Unless otherwise provided or required by law, if there is more than one Trustor, any notice given by Lender to any Trustor is deemed to be notice given to all Trustors.

**STATEMENT OF OBLIGATION FEE.** Lender may collect a fee, not to exceed the maximum amount permitted by law, for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Deed of Trust:

**Amendments.** This Deed of Trust, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Deed of Trust. No alteration of or amendment to this Deed of Trust shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Trustor's residence, Trustor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Trustor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Deed of Trust are for convenience purposes only and are not to be used to interpret or define the provisions of this Deed of Trust.

**Merger.** There shall be no merger of the interest or estate created by this Deed of Trust with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Governing Law.** This Deed of Trust will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Deed of Trust has been accepted by Lender in the State of California.

**Choice of Venue.** If there is a lawsuit, Trustor agrees upon Lender's request to submit to the jurisdiction of the courts of SAN DIEGO County, State of California.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Deed of Trust unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Deed of Trust shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Deed of Trust. No prior waiver by Lender, nor any course of dealing between Lender and Trustor, shall constitute a waiver of any of Lender's rights or of any of Trustor's obligations as to any future transactions. Whenever the consent of Lender is required under this Deed of Trust, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Deed of Trust to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Deed of Trust. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Deed of Trust shall not affect the legality, validity or enforceability of any other provision of this Deed of Trust.

000047

*EXHIBIT "3"*

Loan No: 1041022857

**ED OF TRUST**
{Continued}

Page 10

Property or the improvements to be constructed on the Real Property, whether heretofore or hereafter issued, prepared, or executed, including without limitation all permits, licenses authorizations and approvals, tradomarks and tradenames, and any and all land use entitlements, development rights, sewer capacity, approvals, density allocations and other rights or approvals relating to or authorizing the development or occupancy of the Property, plus all utility or other deposits, reimbursement rights, studies, tests, contracts, plans and specifications, relating to the Property and Improvements.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Deed of Trust.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future leases, rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property together with the cash proceeds of the Rents.

**Trustee.** The word "Trustee" means OLD REPUBLIC TITLE COMPANY, whose address is 1660 HOTEL CIRCLE NORTH, SUITE 500, SAN DIEGO, CA 92108 and any substitute or successor trustees.

**Trustor.** The word "Trustor" means ONE PELICAN HILL ROAD NORTH, L.P..

**TRUSTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS DEED OF TRUST, AND TRUSTOR AGREES TO ITS TERMS, INCLUDING THE VARIABLE RATE PROVISIONS OF THE NOTE SECURED BY THIS DEED OF TRUST.**

TRUSTOR:

ONE PELICAN HILL ROAD NORTH, L.P.

By: _____
JOHN MCMONIGLE, General Partner of ONE PELICAN HILL
ROAD NORTH, L.P.

---

### CERTIFICATE OF ACKNOWLEDGMENT

STATE OF _California_                                    )
                                                        ) SS
COUNTY OF _Orange_                                       )

On _April 18_, 20 _07_ before me, _Brian J. Foxcroft, A notary public_ personally appeared JOHN MCMONIGLE, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

BRIAN J. FOXCROFT
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 1575867
ORANGE COUNTY
My Comm. Exp. May 9, 2008

Signature _____

(Seal)

*EXHIBIT "3"*

  

Loan No: 1041022857

**DEED OF TRUST**
**(Continued)**

Page 9

**Successors and Assigns.** Subject to any limitations stated in this Deed of Trust on transfer of Trustor's interest, this Deed of Trust shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Trustor, Lender, without notice to Trustor, may deal with Trustor's successors with reference to this Deed of Trust and the Indebtedness by way of forbearance or extension without releasing Trustor from the obligations of this Deed of Trust or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Deed of Trust.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Deed of Trust. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Deed of Trust shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Beneficiary.** The word "Beneficiary" means LA JOLLA BANK, FSB, and its successors and assigns.

**Borrower.** The word "Borrower" means ONE PELICAN HILL ROAD NORTH, L.P. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Deed of Trust.** The words "Deed of Trust" mean this Deed of Trust among Trustor, Lender, and Trustee, and includes without limitation all assignment and security interest provisions relating to the Personal Property and Rents.

**Default.** The word "Default" means the Default set forth in this Deed of Trust in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Deed of Trust in the events of default section of this Deed of Trust.

**Existing Indebtedness.** The words "Existing Indebtedness" mean the Indebtedness described in the Existing Liens provision of this Deed of Trust.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Trustor's obligations or expenses incurred by Trustee or Lender to enforce Trustor's obligations under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust.

**Lender.** The word "Lender" means LA JOLLA BANK, FSB, its successors and assigns.

**Note.** The word "Note" means the promissory note dated April 17, 2007, in the original principal amount of $21,600,000.00 from Trustor to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. NOTICE TO TRUSTOR: THE NOTE CONTAINS A VARIABLE INTEREST RATE.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Trustor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property. The words "Personal Property" also include all tangible and intangible items obtained or owned by, or in the possession of Trustor that are directly or indirectly related to the acquisition, development, design, construction, permitting, marketing, or habitation of the Real

*EXHIBIT "3"*

*GOVERNMENT CODE SECTION 27361.7*

*I CERTIFY UNDER PENALTY OF PURGERY THAT THE NOTARY
SEAL ON THE DOCUMENT TO WHICH THIS STATE IS ATTACHED
READS AS FOLLOWS:*

| | |
|---|---|
| *Name of Notary:* | *Brian J. Foxcroft* |
| *Date Commission Expires:* | *May 3, 2009* |
| *County Where Bond is Filed:* | *Orange* |
| *Commission Number:* | *1575867* |
| *Vender No.:* | *SIU1* |
| *Place of Execution:* | *Irvine, CA* |
| *Date:* | *May 3, 2007* |

*Stewart Title of California
By:*

*Mark R. Townsend, Jr.*

000050

*EXHIBIT "3"*

Loan No: 1041022857

**DEED OF TRUST**
**(Continued)**

Page 11

**(DO NOT RECORD)**

## REQUEST FOR FULL RECONVEYANCE
(To be used only when obligations have been paid in full)

To: _____, Trustee

The undersigned is the legal owner and holder of all indebtedness secured by this Deed of Trust. All sums secured by this Deed of Trust have been fully paid and satisfied. You are hereby directed, upon payment to you of any sums owing to you under the terms of this Deed of Trust or pursuant to any applicable statute, to cancel the Note secured by this Deed of Trust (which is delivered to you together with this Deed of Trust), and to reconvey, without warranty, to the parties designated by the terms of this Deed of Trust, the estate now held by you under this Deed of Trust. Please mail the reconveyance and Related Documents to:

Date: _____          Beneficiary: _____

                                                By: _____

                                                Its: _____

000051

*EXHIBIT "3"*

EXHIBIT "A"

The land referred to herein is situated in the State of California,
County of ORANGE, described as follows:

PARCEL 1:

LOTS 1 AND A OF TRACT NO. 15376, IN THE CITY OF NEWPORT BEACH,
COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP
RECORDED IN BOOK 749, PAGES 40 AND 41 OF MISCELLANEOUS MAPS,
RECORDS OF ORANGE COUNTY, CALIFORNIA.

EXCEPTING THEREFROM; ALL OIL, OIL RIGHTS, NATURAL GAS RIGHTS,
MINERAL RIGHTS, AND OTHER HYDROCARBON SUBSTANCES BY WHATEVER
NAME KNOWN, TOGETHER WITH APPURTENANT RIGHTS THERETO, WITHOUT,
HOWEVER, ANY RIGHT TO ENTER UPON THE SURFACE OF SAID LAND NOR
ANY PORTION OF THE SUBSURFACE LYING ABOVE A DEPTH OF 500 FEET,
AS EXCEPTED OR RESERVED IN INSTRUMENTS OF RECORD.

EXCEPT ALL WATER, CLAIMS OR RIGHTS TO WATER, IN OR UNDER SAID
LAND.

PARCEL 2:

EASEMENTS AS SET FORTH IN THE SUBSECTION ENTITLED "PEDESTRIAN
TRAIL" OF THE SECTION ENTITLED "RESERVATIONS TO DECLARANT AND
PARTICIPATING BUILDER" AND IN THE SECTIONS ENTITLED "EASEMENTS
FOR OWNERS", "SUPPORT, SETTLEMENT AND ENCROACHMENT" AND
"UTILITIES AND CABLE TELEVISION" OF THE ARTICLE ENTITLED
"EASEMENTS AND RIGHTS" OF THE DECLARATION OF COVENANTS,
CONDITIONS AND RESTRICTIONS FOR NEWPORT COAST COMMUNITY
ASSOCIATION RECORDED MAY 24, 1991 AS INSTRUMENT NO. 91-257521,
AS AMENDED BY AMENDMENT NO. 1 TO DECLARATION OF COVENANTS,
CONDITIONS AND RESTRICTIONS FOR NEWPORT COAST COMMUNITY
ASSOCIATION RECORDED DECEMBER 6, 1991 AS INSTRUMENT NO.
91-672706, BOTH OF OFFICIAL RECORDS OF ORANGE COUNTY,
CALIFORNIA (COLLECTIVELY, THE "MASTER DECLARATION") AND IN THE
SUPPLEMENTARY DECLARATION OF COVENANTS, CONDITIONS AND
RESTRICTIONS FOR NEWPORT COAST COMMUNITY ASSOCIATION AND TRACT
NO. 15376 RECORDED MAY 12, 1997 AS INSTRUMENT NO. 97-220590 OF
SAID OFFICIAL RECORDS.

End of Legal Description

000052

*EXHIBIT "3"*

**Exhibit 4**

000053

## CHANGE IN TERMS AGREEMENT

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

| Borrower: | ONE PELICAN HILL ROAD NORTH, L.P. (TIN: 36-2207230) 140 NEWPORT CENTER #140 NEWPORT BEACH, CA 92660 | Lender: | LA JOLLA BANK, FSB 390 WEST VALLEY PARKWAY ESCONDIDO, CA 92025 |

**Principal Amount: $21,800,000.00**                                    **Date of Agreement: July 1, 2009**

DESCRIPTION OF EXISTING INDEBTEDNESS. A PROMISSORY NOTE DATED APRIL 17, 2007, WITH A COMMITMENT AMOUNT OF $21,800,000.00. THE NOTE IS SECURED BY A CONSTRUCTION DEED OF TRUST DATED OF EVEN DATE WITH THE NOTE AND RECORDED MAY 3, 2007, IN THE OFFICIAL RECORDS OF THE COUNTY RECORDER OF ORANGE COUNTY, STATE OF CALIFORNIA, AS DOCUMENT NUMBER 2007000283041.

DESCRIPTION OF COLLATERAL. REAL PROPERTY LOCATED AT: 1 PELICAN HILL ROAD NORTH, NEWPORT BEACH, CA 92657.

DESCRIPTION OF CHANGE IN TERMS. THE NOTE TERMS ARE HEREBY MODIFIED AS FOLLOWS:

-Beginning October 1, 2009 the interest only construction period will be extended up to 9 months or through completion of construction, whichever occurs first.

-Upon completion of construction, said loan will be converted to permanent financing for thirty six (36) months with principal and interest payments, amortized over 360 months

-Borrower to deposit at time of closing $1,200,000.00 towards construction costs to be monitored by fund control.

-All other terms to remain the same.

PAYMENT. Subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in accordance with the following payment schedule, which calculates interest on the unpaid principal balance as described in the "INTEREST CALCULATION METHOD" paragraph using the interest rates described in this paragraph: 12 monthly consecutive interest payments, beginning August 1, 2009, with interest calculated on the unpaid principal balance using an interest rate based on the THE LOWEST NEW YORK PRIME RATE IN EFFECT ON THE FIRST BUSINESS DAY OF THE MONTH (CYCLE) AS PUBLISHED IN THE MONEY RATE SECTION OF THE WEST COAST EDITION OF THE WALL STREET JOURNAL, (currently 3.250%), plus a margin of 1.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 4.500%; 36 monthly consecutive principal and interest payments in the initial amount of $105,085.31 each, beginning August 1, 2010, with interest calculated on the unpaid principal balance using an interest rate based on the THE LOWEST NEW YORK PRIME RATE IN EFFECT ON THE FIRST BUSINESS DAY OF THE MONTH (CYCLE) AS PUBLISHED IN THE MONEY RATE SECTION OF THE WEST COAST EDITION OF THE WALL STREET JOURNAL, (currently 3.250%), plus a margin of 1.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 4.500%; and one principal and interest payment of $21,291,946.44 on July 1, 2013, with interest calculated on the unpaid principal balance using an interest rate based on the THE LOWEST NEW YORK PRIME RATE IN EFFECT ON THE FIRST BUSINESS DAY OF THE MONTH (CYCLE) AS PUBLISHED IN THE MONEY RATE SECTION OF THE WEST COAST EDITION OF THE WALL STREET JOURNAL, (currently 3.250%), plus a margin of 1.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 4.500%. The estimated final payment is based on the assumption that all payments will be made exactly as scheduled and that the index does not change; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts on this loan. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

VARIABLE INTEREST RATE. The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the THE LOWEST NEW YORK PRIME RATE IN EFFECT ON THE FIRST BUSINESS DAY OF THE MONTH (CYCLE) AS PUBLISHED IN THE MONEY RATE SECTION OF THE WEST COAST EDITION OF THE WALL STREET JOURNAL (the "Index"). The Index currently is 3.250% per annum. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute Index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each MONTH. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 3.250% per annum. The interest rate or rates to be applied to the unpaid principal balance during this loan will be the rate or rates set forth herein in the "Payment" section. Notwithstanding any other provision of this Agreement, after the first payment stream, the interest rate for each subsequent payment stream will be effective as of the last payment date of the just-ending payment stream. NOTICE: Under no circumstances will the interest rate on this loan be less than 5.500% per annum or more than (except for any higher default rate shown below) the lesser of 11.500% per annum or the maximum rate allowed by applicable law. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (A) Increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date, (B) Increase Borrower's payments to cover accruing interest, (C) Increase the number of Borrower's payments, and (D) Continue Borrower's payments at the same amount and increase Borrower's final payment.

INTEREST CALCULATION METHOD. Interest on this loan during the initial interest-only payment period is computed on a 365/365 simple interest basis; that is, by applying the ratio of the interest rate over the number of days in a year, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Interest on this loan following the initial interest-only phase is computed on a 30/360 simple interest basis; that is, with the number of days in a year, multiplied by the outstanding principal balance, multiplied by a month of 30 days. Interest for the odd days before the first full month is calculated on the basis of the actual days and a 365-day year. All interest payable under this loan is computed using these methods in the described order.

PREPAYMENT. Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: LA JOLLA BANK, FSB; 390 WEST VALLEY PARKWAY; ESCONDIDO, CA 92025.

LATE CHARGE. If a payment is 10 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment or $5.00, whichever is greater.

INTEREST AFTER DEFAULT. Upon default, the interest rate on this loan shall, if permitted under applicable law, immediately increase by adding a 3.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. After maturity, or after this loan would have matured had there been no default, the Default Rate Margin will continue to apply to the final interest rate described in this Agreement.

DEFAULT. Each of the following shall constitute an Event of Default under this Agreement:

Payment Default. Borrower fails to make any payment when due under the Indebtedness.

Other Defaults. Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

False Statements. Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

Death or Insolvency. The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

Creditor or Forfeiture Proceedings. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Indebtedness.

000054

*EXHIBIT "4"*

## CHANGE IN TERMS AGREEMENT
### (Continued)

Loan No: 1041022857                                                                           Page 2

This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the indebtedness evidenced by this Note.

**Events Affecting General Partner of Borrower.** Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

**Change in Ownership.** The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within ten (10) days; or (2) if the cure requires more than ten (10) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Agreement and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Agreement if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of ORANGE County, State of California.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $10.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**COLLATERAL.** Borrower acknowledges this Agreement is secured by the following collateral described in the security instrument listed herein: a Mortgage or Deed of Trust to a Trustee in favor of Lender on real property located in ORANGE County, State of California.

**LINE OF CREDIT.** This Agreement evidences a straight line of credit. Once the total amount of principal has been advanced, Borrower is not entitled to further loan advances. Borrower agrees to be liable for all sums either: (A) Advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Agreement at any time may be evidenced by endorsements on this Agreement or by Lender's internal records, including daily computer print-outs.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**BALLOON PAYMENT NOTICE. THIS LOAN CONTAINS PROVISIONS THAT ALLOW FOR A BALLOON PAYMENT AT MATURITY.**

**AMORTIZATION. REGULAR PAYMENTS ARE BASED ON A 30 YEAR AMORTIZATION PERIOD WITH A LOAN MATURITY DATE OF 3 YEARS AS STATED ABOVE.**

**SUCCESSORS AND ASSIGNS.** Subject to any limitations stated in this Agreement on transfer of Borrower's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Borrower, Lender, without notice to Borrower, may deal with Borrower's successors with reference to this Agreement and the indebtedness by way of forbearance or extension without releasing Borrower from the obligations of this Agreement or liability under the indebtedness.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: LA JOLLA BANK, FSB, 360 WEST VALLEY PARKWAY, ESCONDIDO, CA 92025.

**MISCELLANEOUS PROVISIONS.** If any part of this Agreement cannot be enforced, this fact will not affect the rest of the Agreement. Lender may delay or forgo enforcing any of its rights or remedies under this Agreement without losing them. Borrower and any other person who signs, guarantees or endorses this Agreement, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, no party who signs this Agreement, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party, partner, or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Agreement are joint and several.

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.**

**BORROWER:**

**ONE PELICAN HILL ROAD NORTH, L.P.**

By: _____
JOHN M. McMONIGLE, General Partner of ONE
PELICAN HILL ROAD NORTH, L.P.

LASER PRO Lending, Ver. 5.47.00.005  Copr. Harland Financial Solutions, Inc. 1997, 2005.  All Rights Reserved.  - CA  C:\HARLAND\CFI\LPL\D20C.FC  TR-2254  PR-16

000055

*EXHIBIT "4"*

**Exhibit 5**

**Karen Mosich**

| | |
|---|---|
| From: | Karen Mosich |
| Sent: | Monday, December 14, 2009 4:06 PM |
| To: | 'Jon Pasquini' |
| Cc: | John McMonigle; 'Martin Rodriguez' |
| Subject: | One Pelican Hill Road |
| | |
| Importance: | High |

Jon,

In follow-up to our conversation on Friday, as mentioned we continue to have issues with getting payments released on the One Pelican Hill Road North project. When the loan was put together, we were asked to spell out all remaining costs to compete by cost category and to identify which costs would be funded by the bank, which costs would be funded by investor funds that were controlled by the bank and which costs would be paid directly by investor funds. During the course of this task and through the finalization of the loan there was no mention that there would be a hold back of construction funds, yet with each voucher submittal it seems as though there is a new reason we are given for why funds will not be disbursed or will be delayed in their disbursement. As things stand right now we have been advised by Mary Louie of the following:

- Line items will not be fully disbursed, there will be a 5-10% hold back.
- Materials must be installed before funding 100% of the material costs.
- Although the estimate to complete for the Tennis Courts was allowed for in the Contingency Cost code, we were advised this item will not be paid.

These above noted changes are consequently causing delays in the completion of the project. It was fully anticipated that the costs designated as both bank funded and funded by investor funds controlled by the bank would be disbursed as requested without any line item hold back. If a holdback was required, if should have been addressed upfront and identified accordingly as there would have been more funds noted as investor funds for each of the affected cost categories. In regards to the materials, La Jolla Bank is well aware of the custom nature of this project and the need to have these items paid in full prior to delivery. Again if these costs were not going to be funded in conjunction with the needs of this project this should have been addressed upfront and identified accordingly . On this particular item, we have attempted to arrange a COD payment with La Jolla and the subcontractor on certain items, that was not accepted by Mary. Lastly, in regards to the items allotted for under Contingency. This cost category was utilized at the request of the La Jolla since they did not have cost categories that covered these items and this is where the previous funds of similar nature have been disbursed. The funds designated in this account were never intended to be utilized as a contingency for the project and therefore need to be disbursed as originally outlined.

Jon, we are working diligently to keep things moving however, it cannot be done with these new constraints that are being imposed upon us and take completion of the project off-track. It is imperative that the funds in control of La Jolla Bank be disbursed as originally anticipated for the timely completion of this project, without a 5-10% line item holdback, with an appropriate arrangement for 100% payment of custom materials prior to installation and with the contingency being utilized as anticipated. The "finish line" of completion of this project is insight and needs to be the focus of both the La Jolla team along with the Monarch/McMonigle team. I look forward to hearing back from you shortly with word that things will get back on track.

Kind regards,

Karen

1

000057

*EXHIBIT "5"*

**Karen Mosich**

| | |
|---|---|
| **From:** | Karen Mosich |
| **Sent:** | Thursday, February 18, 2010 10:28 AM |
| **To:** | 'Jon Pasquini' |
| **Subject:** | RE: One Pelican Hill Road/32nd St. |

Jon,

We have asked many, many times if there is a report that can be forwarded to us from the inspector so we can understand how the project is being evaluated and what the areas of concern. Can you please get us something so we can all get on the same page?

Thanks,

Karen

---

**From:** Jon Pasquini [mailto:jon.pasquini@ljbank.com]
**Sent:** Wednesday, February 17, 2010 5:11 PM
**To:** Karen Mosich
**Cc:** John McMonigle; Mary Louie
**Subject:** RE: One Pelican Hill Road/32nd St.

Karen, sorry we missed you today. I've looked at the numbers and visited the site and do not feel there is any wiggle room on bringing in the money we are requesting for Pelican Hill.

I have a few questions on 32nd St. before we proceed:

- Is Unit B finished? If so, is it leased?
- Please send over the C of O for both units if they are complete.
- Please send over the Lease for C; And B if it is leased.
- Please send over the HOA financials/Budgets, etc.
- We need some sort of Addendum to the purchase contract. I do not feel a Lender should be named in the said contract. La Jolla Bank is not prepared to offer the terms stated as conditions of the contract, thusly we are concerned of the viability of the contract a selling point in our presentation to committee and an obvious strength to you as the Borrower. Please advise.

Thank you, Karen. Talk to you soon.

---

**From:** Karen Mosich [mailto:kmosich@mcmoniglegroup.com]
**Sent:** Wednesday, February 17, 2010 11:25 AM
**To:** John McMonigle
**Cc:** Jon Pasquini
**Subject:** One Pelican Hill Road

John,

Jon was not in his office, I left him a message to call you on your cell phone regarding One Pelican.

Thanks,

Karen

1

000058

*EXHIBIT "5"*

**Karen Mosich**

| | |
|---|---|
| **From:** | Karen Mosich |
| **Sent:** | Tuesday, December 08, 2009 10:23 AM |
| **To:** | 'Jon Pasquini' |
| **Cc:** | 'Martin Rodriguez' |
| **Subject:** | FW: La Jolla Bank |

**Importance:**      High

Jon,

I left you a voice message regarding the below. This is obviously a big issue and once again not something that was contemplated when we put together these cash flows. We need access to the bank funds to complete the project. The below proposal is not satisfactory, we need release of funds to allow the cabinets and other items to be delivered. Having Mary meet the order so she can verify that the items are onsite needs to be considered. To hold all remaining funds until installation will not work. We can potential revise the amount to down a small amount but not to the extent that is not being but upon us with Mary's below e-mail.

Karen

*Karen A. Mosich*
*Chief Financial Officer*
*The McMonigle Group*
*1000 Newport Center Drive*
*Newport Beach, CA 92660*
*Phone: 949-734-6265*
*Fax: 949-734-6365*
*www.mcmoniglegroup.com*
*John McMonigle DRE License #  01123869*

 **MCMONIGLE**
          GROUP

---

**From:** Mary Louie [mailto:mary.louie@ljbank.com]
**Sent:** Saturday, December 05, 2009 5:09 PM
**To:** Karen Mosich
**Cc:** Corey Gulbranson; Janine Brazier; Jon Pasquini; Martin Rodriguez; Connie Kary
**Subject:** RE: La Jolla Bank

Karen,

I apolize for the inconvenience but La Jolla Bank is unable to pay any vendor in full until they have delivered and installed their product. Once an inspection has been performed and all paperwork are in order the Bank will release any remaining funds on a contract. La Jolla Bank has been paying all deposits up to 50% on all custom work.

In your final version of the estimate to complete it does indicates Warren Sheets is due for funds for design and reimbursable out of overhead approximately $250,000.00 which is additional funds needed to finish the project. Maybe you can use the additional Investor Funds that you are receiving at this time and once the cabinets, vanities, etc. are installed La Jolla Bank will then re-evaluate the budget and pay out of those line items.

1

000059

*EXHIBIT "5"*

Mary

---

**From:** Karen Mosich [mailto:kmosich@mcmoniglegroup.com]
**Sent:** Friday, December 04, 2009 2:50 PM
**To:** Mary Louie
**Cc:** Corey Gulbranson; Janine Brazier
**Subject:** La Jolla Bank
**Importance:** High

Mary,

I understand that you are holding all of the Warren Sheets vouchers that were sent to you for:

- Cabinets
- Light Fixtures
- Fireplaces
- Millwork/Doors/Frames

As I know you are aware, almost all of the items in this home are custom in nature and therefore require that the materials be paid for in full prior to or at the time of delivery. We need to come up with a viable solution so this home does not stall out and is completed in the timeframe we are striving for. If the bank will not release the funds prior to delivery as is spelled out in the contracts, then we will need to make arrangements for a representative of La Jolla Bank to meet the delivery of the materials with a cashier's check at the One Pelican Hill Road North site so that building of the home can continue to progress.

Please confirm that this is the way we will need to progress so that we can come up with a delivery schedule.

Also, please note that I spoke with Corey and we do not have anything in storage for this home.

Kind regards,

Karen

*Karen A. Mosich*
*Chief Financial Officer*
*The McMonigle Group*
*1000 Newport Center Drive*
*Newport Beach, CA 92660*
*Phone: 949-734-6265*
*Fax: 949-734-6365*
*www.mcmoniglegroup.com*
*John McMonigle DRE License #: 01123869*

 **MCMONIGLE**
GROUP

CONFIDENTIALITY NOTICE
This e-mail correspondence, and all documents, files or previous e-mail messages attached
to it or reproduced within it may contain information that is confidential or legally
privileged. If you are not the intended recipient, or a person responsible for delivering

2

000060

*EXHIBIT "5"*

it to the intended recipient, you are hereby notified that you must not read this transmission and that any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by telephone or return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Unless it specifically so states, this communication does not reflect an intention by the sender or the sender's client or principal to conduct a transaction or make any agreement by electronic means. Unless it specifically so states, nothing contained in this message or in any attachment shall satisfy the requirements for a writing, and nothing contained herein shall constitute a contract or electronic signature under the Global and National Commerce Act, any version of the Uniform Electronic Transactions Act or any other statute governing electronic transactions.

3

000061

*EXHIBIT "5"*

Michelle A. Queyrel
SFR     Attached        RES        Active     Residential          Tue, Nov 1, 2011 02:44 PM        Ref: 1
                                    518 N. ROXBURY Dr.             Beverly Hills (BHL)       Price $40,000,000
                                    Beverly Hills (C01)    Zip 90210-    TGNO 592D7
                                    Los Angeles County (LA)   XSTS     Aerial Map



CLW-11546745    Media 21    Builder Tract ()
Bed 9                        Model ()
Baths 13         Style Mediterranean       Stories              Floors 0
View No View                                HOA Dues $ 0 + $      Land Use/Yr $
ASqFt 13,885 Assessor    Yr/Blt 2009        Land
ALotSize 58,370 Other    Dim                Acres Other
Prkng Direct Garage Access, Garage Door Opener, Uncovered, Garage Attached, Side by Side Parking
Tot Prkg     Garage, # cars A Rem    # Uncovered Spaces      Cprt    # Garages    RV Acc    Range $- No

Gated Mediterranean Estate situated on 1.3 acres on one of the most coveted streets in Beverly Hills. True masterpiece inspired by renowned architect Kevin Clark, incredible design & great floor plan with the highest level of taste, quality & craftsmanship. Main House offers 7 Bdrms & 9 Bathrooms, including a Master Retreat with spacious His & Her baths & closets. Wood paneled library with coffered ceilings, elegant dining room & fully equipped gourmet kitchen that opens to spectacular breakfast alcove. Generous but intimate family room with wood paneled bar that opens to the yard. Romantic stone wine cellar/tasting room & spacious media room. 2BR Guest House with a complete kitchen & living area. Expansive backyard features a loggia, swimming pool/spa, tranquil fountains, lush gardens & pristine landscaping. Great for entertainment & family living with an indoor/outdoor flow. Terrific privacy with state of the art security system. Private showings to pre qualified clients only.
Directions Sunset to North Roxbury
Special Conditions: Standard Sale or Lease/None

| | | Rooms | | | |
|---|---|---|---|---|---|
| Bedrooms | | | Living Rm Living Room | | |
| Kitchen | | | Dining Breakfast Counter/Bar, Formal Dining Rm | | |
| Total Baths 13 | | Full Baths | 3/4 Baths | 1/2 Baths | 1/4 Baths |
| Baths Desc | | | | | |

Other Inside Laundry, Individual Laundry Room, Den/Office, Library, Family Room, Guest-Maid Quarters, Gym, Wine Cellar, Guest House/Casita

Amenities
Pool Heated & Filtered, Private Pool
Spa
TV TV Antenna, Cable TV                                       Water Heater
Fixed Bathroom, Den, Dining Room, Guest House, Library, Living Room, Master Bedroom
Appliances Dishwasher, Dryer, Freezer, Garbage Disposal, Refrigerator, Washer, Built-in BBQ, Range Hood, Microwave
Other Vacuum Central
High or Mid-Rise Amenities
Security Intercom, Gated Community, Security System - Owned, Closed Circuit TV

Interior/Exterior/Structural
Heating Central                   Cooling Attic Fan, Central         Floors Wall-to-Wall Carpet, Granite, Hardwood, Marble
Disability Access Elevator
Entry Location          Common Walls                      Plumbing
Roof Composition        Exterior Construction
Patio Lanai
Cond As Is              Sprinklers
Doors/Windows
Structural Other Guest Quarters - Separate Entrance

Lot/Community/Association
APNO 4345005023    Zoning BHR1*    Lot/Block/Tract //    City Inspection Required No   Mello Roos      Sewer In Street
Lot
Legal
Water                         Water District       Yard                                   Units
HS Dist                       Elemen               Junior        High Sch
Amenities
Builder's Name    HOA-1 $ 0    HOA1 Fees Frequency          HOA-2 $         HOA2 Fees Frequency         Builder's Name
Other Association Fees
HOA Phone    Tota HOA Dues    Land           Land Lse/Yr $     Distance to Beach (miles)    Total HOA Dues Frequency

Financial Information
Terms Cash, Cash To New Loan           Private Transfer Taxes No         Tax Year    Total Property Tax $       Total Assessed Value $

Showing Instructions
Instr 24-Hour Notice, Call Listing Agent                              Occupant /            Phone to Show
Comp 2.5%    Dual/Var No                                             Consider Lease No     Possession Close of Escrow
Add'l Comp
LockBox
List Type Exclusive Right To Sell or Lease/Full Service               Gate Code     Misc

List Office/Agent Info
List Office Hilton & Hyland (CLW-B08065)    Office 310-276-3311   Ofc/Fax 310-275-4998   AgtFax     Res             LA Direct 310-278-3311
List Agent Christine Martin (CB W-X87758)   DRE# 01425569    Fager   Cell 310-614-5779    Primary    LA Toll Free
Agt E-Mail Yes              Agt WSite                                  Co List Office Hilton & Hyland   Co/LA Ofc/Fax 310-278-4998
CoList Agent Tiffany Martin (CLW-281334)   DRE# 01754240    Pref. Phone     CoLA AgtFax    CoList Agt E-Mail Yes   CoLA Mobile 310-696-9612   Co/LA Direct 310-278-3311   Co/LA Toll Free
Price Last
Price Includes
Phone to Show Type                         Phone to Show Name                                Show Phone
List Agent Contact Priority: Cell, Direct, Email, , ,
Co-List Agent Contact Priority: Cell, Direct, Email, , ,
Reslp Listing

Listing Activity
List Date 4/9/2011     Date Added 8/18/2011     Tran Date 8/17/2011        DOM 85         LP/SqFt $2,880.81
Org Price $ 40,000,000    Prev Price $          Cur List Prc $40,000,000    CDOM 85   Off Market     Comp 2.5%

The accuracy of all information, regardless of source, including but not limited to square footages and lot sizes, is deemed reliable but not guaranteed and should be personally verified through personal inspection by and/or with the appropriate professionals.
© Copyright, California Regional Multiple Listing Service, Inc.; Copyright, CARETS/R; CARETS

*EXHIBIT "5"*

**Exhibit 6**

000062

Home | Deposit Insurance | Consumer Protection | Industry Analysis | Regulations & Examinations | Asset Sales | News & Events | About FDIC

Home > Industry Analysis > Failed Banks > Failed Bank List > Failed Bank Information

## Failed Bank Information

**Information for La Jolla Bank, FSB, La Jolla, CA**

   I. Introduction
  II. Press Release
 III. Acquiring Financial Institution
 IV. Question and Answer Guide
  V. Banking Services
 VI. Loan Customers
VII. Possible Claims Against the Failed Institution
VIII. Priority of Claims
 IX. Dividend Information
  X. Brokered Deposits
 XI. Purchase and Assumption Agreement (486 kb PDF File - PDF Help)
XII. La Jolla Bank Contact Information
XIII. Balance Sheet Summary

Please be advised you will not receive any email notification to claim/unlock/unsuspend your account or to provide any private information. Please be aware of any Phishing Scams to obtain information from you.

**I. Introduction**

On Friday, February 19, 2010, La Jolla Bank, FSB, La Jolla, CA was closed by the Office of Thrift Supervision, and the Federal Deposit Insurance Corporation (FDIC) was named Receiver. No advance notice is given to the public when a financial institution is closed.

The FDIC has assembled useful information regarding your relationship with this institution. Besides a checking account, you may have Certificates of Deposit, a car loan, a business checking account, a commercial loan, a Social Security direct deposit, and other relationships with the institution. The FDIC has compiled the following information, which should answer many of your questions.

Back to top

**II. Press Release**

The FDIC has issued a press release (PR-034-2010) about the institution's closure. If you represent a media outlet and would like information about the closure, please contact Greg Hernandez at 1-202-898-6984.

Back to top

**III. Acquiring Financial Institution**

All deposit accounts have been transferred to OneWest Bank, FSB, Pasadena, CA ("assuming institution") and will be available immediately. The former La Jolla Bank, FSB locations will reopen as branches of OneWest Bank, FSB during regular business hours at the former La Jolla Bank, FSB branches.

Your transferred deposits will be separately insured from any accounts you may already have at OneWest Bank, FSB for six months after the failure of La Jolla Bank, FSB. Checks that were drawn on La Jolla Bank, FSB that did not clear before the institution closed will be honored as long as there are sufficient funds in the account. For more information on deposit insurance,

*EXHIBIT "6"*

you may speak to an FDIC representative by calling 1-800-894-2927 or visit
EDIE, the FDIC's Electronic Deposit Insurance Estimator.

EDIE - FDIC's Electronic Deposit Insurance Estimator

You may withdraw your funds from any transferred account without an early
withdrawal penalty until you enter into a new deposit agreement with
OneWest Bank, FSB as long as the deposits are not pledged as collateral for
loans. You may view more information about OneWest Bank, FSB by visiting
their web site.

OneWest Bank, FSB (www.owb.com)

Back to top

**V. Banking Services**
The Automated Teller Machines (ATM) and online service will remain
available.

The bank will maintain its regular business hours and you may continue to
use the services to which you previously had access, such as safe deposit
boxes, night deposit boxes, wire services, etc.

Your checks will be processed as usual. All outstanding checks will be paid
against your available balance(s) as if no change had occurred. Your new
bank will contact you soon regarding any changes in the terms of your
account. If you have a problem with a merchant refusing to accept your
check, please contact your branch office. An account representative will
clear up any confusion about the validity of your checks.

All interest accrued through Friday, February 19, 2010 will be paid at your
same rate. OneWest Bank, FSB will be reviewing rates. You will be notified
of any changes.

Your automatic direct deposit(s) and/or automatic withdrawal(s) will be
transferred automatically to your new bank. If you have any questions or
special requests, you may contact a representative of your assuming
institution at your branch office.

Back to top

**VI. Loan Customers**
If you had a loan with La Jolla Bank, FSB, you should continue to make your
payments as usual. The terms of your loan will not change, because they
are contractually agreed to in your promissory note. Checks should be made
payable as usual and sent to the same address until further notice. If you
have further questions regarding an existing loan, please contact your loan
officer.

For all questions regarding new loans and the lending policies of OneWest
Bank, FSB please contact your branch office.

Please see A Borrower's Guide to an FDIC Insured Bank Failure for
additional information.

Back to top

**VII. Possible Claims Against the Failed Institution**
Claims against failed financial institutions occur when bills sent to the
institution remain unpaid at the time of failure. If you or your company
provided a service or product, leased space, furniture, or equipment to La
Jolla Bank, FSB after Friday, February 19, 2010 and have not been paid,
you do not have a claim against La Jolla Bank, FSB. Please follow your
normal billing procedures by providing an invoice as instructed.

If you or your company provided a service or product, leased space,
furniture, or equipment to La Jolla Bank, FSB prior to Friday, February 19,
2010 and have not been paid, you may be entitled to a claim against the

000064

**EXHIBIT "6"**

bank, have provided a product or a service for La Jolla Bank, FSB prior to the bank's failure for which you have not been paid and you have not received communication, please contact:

> Federal Deposit Insurance Corporation
> Receiver: La Jolla Bank, FSB
> 40 Pacifica, Suite 1000
> Irvine, CA 92618
> Attention: Claims Agent

**Please note: There are time limits for filing a claim, your claim must be filed on or before 5/26/2010.**

All shares of La Jolla Bank, FSB were owned by its holding company, La Jolla Bancorp, Rancho Santa Fe, CA. The holding company was not included in the closing of the bank or the resulting receivership. If you are a shareholder of La Jolla Bancorp, please do not contact or file a claim with the Receiver. You may contact La Jolla Bancorp directly for information as follows:

> La Jolla Bancorp
> 6134 La Granada
> Rancho Santa Fe, CA 92067
> 1-858-756-7888

Back to top

### VIII.  Priority of Claims

In accordance with Federal law, allowed claims will be paid, after administrative expenses, in the following order of priority:

1. Depositors
2. General Unsecured Creditors
3. Subordinated Debt
4. Stockholders

Back to top

### IX.  Dividend Information

No dividends have been declared at this time.

Dividend Information on Failed Financial Institutions

Back to top

### X.  Brokered Deposits

The FDIC offers a reference guide to deposit brokers acting as agents for their investor clientele.  This site outlines the FDIC's policies and procedures that must be followed by deposit brokers when filing for pass-through insurance coverage on custodial accounts deposited in a failed FDIC Insured Institution.

Deposit Broker's Processing Guide

Back to top

General Disclaimer

Last Updated 10/27/2010                                    clservicing@fdic.gov

Home | Contact Us | Search | Help | SiteMap | Forms | En Español
Website Policies | Privacy Policy | USA.gov | FDIC Office of Inspector General
Freedom of Information Act (FOIA) Service Center | FDIC Open Government Webpage | No FEAR Act Data

*EXHIBIT "6"*

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as: **DEBTOR'S OPPOSITION TO MOTION FOR RELIEF FROM STAY; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF COREY GULBRANSON IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On November 1, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served): On _____, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on November 1, 2011, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

Debtor: Corey Gulbranson – corey@onepelicanhill.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| November 1, 2011 | Gretchen Crumpacker | /s/ **Gretchen Crumpacker** |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

MAINDOCS-#168902-v1-OnePelican_OppToRFS.DOC

NEF SERVICE LIST

- Richard Dinets    rdinets@allenmatkins.com
- Janet D Gertz    janet.gertz@bakermckenzie.com
- Michael J Hauser    michael.hauser@usdoj.gov
- Robert E Huttenhoff    rhuttenhoff@shbllp.com
- Payam Khodadadi    pkhodadadi@mcguirewoods.com
- Sean A Okeefe    sokeefe@okeefelc.com
- Bertrand Pan    bertrand.pan@dlapiper.com
- Kurt Ramlo    kurt.ramlo@dlapiper.com, evelyn.rodriguez@dlapiper.com – **COUNSEL TO ONE WEST BANK**
- Nanette D Sanders    becky@ringstadlaw.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com;vcorbin@winthropcouchot.com